No. 55,368

STATE OF KANSAS, *Appellee,* v. BRADLEY R. BOAN, *Appellant.*

(686 P.2d 160)

Opinion filed July 13, 1984.

*Jay H. Vader,* of Jenkins, Way, Turner & Vader, Chartered, of Kansas City, argued the cause and was on the brief for the appellant.

*Nick A. Tomasic,* district attorney, argued the cause, and *Robert T Stephan,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered

*Per Curiam:* This is a direct appeal by the defendant, Bradley R. Boan, from convictions by a jury in two consolidated criminal cases. Case number 81 CR 1322 involved homicides which occurred at the Kansas University Medical Center on March 20, 1981. This will be referred to in the opinion as the KU incident. On that date defendant Boan drove to the KU Medical Center in his 1971 Chevrolet Malibu. In the vehicle he had a shotgun with shells. He parked in front of the hospital emergency room, got out of the car, walked around the car, took the shotgun out and proceeded to load it, standing next to the car. He then walked

into the emergency room, saying nothing. He saw a number of medical personnel standing in the hallway and fired the shotgun in their direction, killing a doctor. When a woman, who was there as a visitor, screamed, he turned the shotgun toward her and killed her. A police officer in uniform then drew Boan's attention, and Boan fired once at him. Boan then left the emergency room, put the shotgun in his car, and drove off. The police department responded to the initial call. The Kansas Bureau of Investigation conducted a very extensive nine-month investigation. Shotgun shells found at various locations at the medical center were processed and retained by the KBI laboratory in Topeka. As a result of this incident, the defendant was charged and convicted of two counts of murder in the first degree (K.S.A. 21-3401) and one count of aggravated assault on a law enforcement officer (K.S.A. 21-3411).

In case No. 81 CR 1277, defendant was charged with aggravated assault on a law enforcement officer (K.S.A. 21-3411) and aggravated assault (K.S.A. 21-3410) on a Baptist minister. The evidence showed that on the morning of December 9, 1981, defendant Boan drove his 1971 Chevrolet Malibu to the Baptist church at 55th and Klamm Road in Wyandotte County. He parked the car, got out of the car, removed a shotgun and loaded it as he stood beside the car. He then walked into the rectory looking for the Baptist minister, carrying the shotgun with him. The minister and his two assistants, on seeing Boan coming with the shotgun, barricaded themselves in the office. They called the police. As Boan was leaving the rectory a police officer drove up. He was in uniform and in a marked police car. Upon seeing him, Boan aimed the shotgun at the police officer, causing the police officer to duck for cover. Boan then jumped into his car and drove to his parent's home several blocks away. The police officer pursued him, and when they arrived at the home, Boan got out of his car, aimed the shotgun at the officer, and walked toward him. Boan then ran into the home. After a period of time, during which the police used tear gas, Boan was apprehended. KBI agents at the scene took possession of the shotgun and a number of shotgun shells both from the inside of the home and from the interior of Boan's car. In the opinion, we will refer to this case as the church incident.

The shotgun and the shells were later examined at the KBI

laboratory in Topeka. It was found that the strikings on the shotgun shells found at the KU Medical Center following the KU incident matched with the shotgun. The shells taken from the house and car also matched the shell casings that were recovered at the medical center.

Following the defendant's apprehension on December 9, 1981, statements were taken from defendant by a detective from the Kansas City, Kansas, police department and also by a special agent with the KBI. In those statements, Boan admitted that he was the individual involved in both the KU incident and the church incident. He admitted that he had used the shotgun in both crimes. At the trial, the evidence was undisputed that the defendant was the person involved in both the KU incident and the church incident. The only defense presented in both cases was that defendant was not guilty by reason of insanity. The jury rejected this defense, finding defendant guilty as charged in both cases. Defendant appealed his convictions.

At the outset, it should be stated that this case was prosecuted and defended by two able trial lawyers who represented each side in a highly professional manner. The case was a difficult one, because the evidence was undisputed that defendant was suffering from chronic paranoid schizophrenia, a severe mental illness for which defendant had been treated for several years prior to the two incidents involved here. The defendant raises twenty points on the appeal. Many of these points involve rulings on motions filed by the defendant before the true facts were developed in the course of discovery.

Four of the issues raised on appeal involve the defendant's competency to stand trial. Defendant maintains that the trial court erred in finding him competent to stand trial, in refusing additional testing as to incompetency, in refusing to submit the question of defendant's competency to a jury, and in overruling yet another motion to determine defendant's competency. The record discloses that, not long after defendant was charged, he was referred by the court to Larned State Hospital for examination as to his competency to stand trial. On February 9, 1982, Dr. G. W. Getz of that hospital reported to the court that defendant was not competent to stand trial. On the basis of that report, the district court ordered that defendant be committed to Larned State Hospital for further evaluation and treatment. He remained

there for a period of time during which he was given medication for his mental problems. On April 26, 1982, Dr. Getz advised the court by letter that defendant was now competent to stand trial and assist in his defense. Defendant then filed motions for additional testing and to impanel a jury to help determine competency. The district court denied defendant's motions and found defendant competent to stand trial but appointed a physician to monitor and treat the defendant while he was in jail. From the entire record, we have concluded that no abuse of discretion has been shown in the determination of the trial court that defendant was competent to stand trial; nor was there abuse of discretion in denying defendant's other motions. K.S.A. 22-3301, 22-3302, and 22-3303 are the applicable statutes which set forth the procedure for determining competency. The 1982 amendment to K.S.A. 22-3302 is not applicable because this case arose prior to the effective date of that amendment. This court interpreted the statutory procedure to be followed in *State v. Costa,* 228 Kan. 308, 613 P.2d 1359 (1980). In *Costa,* it was noted that under K.S.A. 22-3302(3), a trial court has several options available to assist the court in making a determination of competency, including the impaneling of a six-person jury. A district court is not required to use a jury. In this case defendant presented no evidence to the trial court to show that his counsel was unable to prepare a defense to the charges or that defendant did not understand the nature and purpose of the proceedings against him or was unable to assist in making his defense. Under all the circumstances shown in the record, we find no abuse of discretion or error in the rulings of the trial court involving defendant's competency to stand trial.

The defendant's next point is that the trial court erred in refusing to suppress defendant's statements made to law enforcement officers after his arrest on December 9, 1981. Defendant filed a motion to suppress pursuant to K.S.A. 22-3215. At that time, counsel for defendant had not as yet determined that the defense in the case would be that of insanity. Simply stated, defense counsel contends that any possible statement taken from defendant Boan on December 9, 1981, the date of the church incident, should be held to be involuntary because of defendant's mental status at the time the statements were taken. This argument is based upon the fact that the medical authorities at

Larned State Hospital had concluded in their letter report to the court that defendant was incompetent to stand trial and was legally insane at the time of the church incident. Counsel for defendant argues that, under those circumstances, defendant could not be competent so as to be able to waive his *Miranda* rights and understand the significance thereof. At the *Jackson v. Denno* hearing on the motion to suppress, the evidence was undisputed that defendant was properly advised of his *Miranda* rights, that no threats or promises were made to him, that defendant was sober and cooperative, and that defendant read aloud a form advising him of his rights and stated that he understood his rights. There was no evidence of pressure or coercion of any kind. The defendant then gave detailed statements to the police officers admitting his involvement in the church incident and to a KBI agent concerning his actions at the KU medical center.

In determining defendant's motion to suppress at the conclusion of the *Jackson v. Denno* hearing, the trial court, on the basis of the totality of circumstances, including the evaluation reports from Larned State Hospital, found that the statements were given voluntarily, were not the result of pressure and coercion, and were admissible into evidence.

The question as to the effect of mental illness on the voluntariness of a confession has been before this court on several occasions. In *State v. Pyle*, 216 Kan. 423, 440, 532 P.2d 1309 (1975), it was held that the test for determining whether a suspect has the mental capacity to make a voluntary confession is the same as the test for determining his criminal responsibility for committing the crime. In absence of insanity meeting the *M'Naghten* test, the mental condition of a defendant at the time he makes a statement is relevant to the issue of voluntariness but is not necessarily conclusive; its weight is for the trier of fact. A trial court's finding, after a *Jackson v. Denno* hearing, that the defendant was sane and made his confessions knowingly and voluntarily is binding on appellate review if supported by substantial competent evidence. More recent cases in accord with this position are *State v. Gilder*, 223 Kan. 220, 574 P.2d 196 (1977); *State v. Buckner*, 221 Kan. 117, 120, 558 P.2d 1102 (1976); *State v. Wright*, 219 Kan. 808, 549 P.2d 958 (1976).

In this case, the first report from Larned State Hospital dated

February 9, 1982, stated that it *is probable that defendant was aware of the nature and seriousness of his behavior* on March 20 and December 9, 1981. In the written statement and also in the tape recording of the interview with Boan, the defendant described in great detail the events surrounding both the KU incident and the church incident. Under all the circumstances, we cannot say that the trial court's order finding the statements were voluntary and admitting them into evidence was not supported by substantial competent evidence. In any event, other evidence of defendant's participation in the two incidents was overwhelming, and the failure to suppress the confessions would, at most, constitute harmless error. At the time of the trial, defense counsel introduced into evidence the tape recording of defendant's confession to the KBI agent for the purpose of showing that the defendant was irrational and insane at the time. Under all the circumstances, we find that the failure of the trial court to suppress the defendant's statements was not error.

Defendant raises several issues involving extensive media publicity about the case which the defense maintains was prejudicial and denied defendant a fair trial. Following the preliminary hearing, defendant sought dismissal of the case because of prejudicial publicity resulting from the reading of defendant's confessions at the preliminary hearing. The defendant argues that the court should have closed the preliminary hearing from the public because of these confessions. We find no error in the failure of the court either to close the preliminary hearing or in overruling defendant's motion to dismiss. In *Kansas City Star Co. v. Fossey*, 230 Kan. 240, 630 P.2d 1176 (1981), this court held that a trial court may close a preliminary hearing and seal the record only if: (1) the dissemination of information from the pretrial proceeding and its record would create a clear and present danger to the fairness of the trial, and (2) the prejudicial effect of such information on trial fairness cannot be avoided by any reasonable alternative means. The record shows that the preliminary hearing was held on June 22 and the trial began on September 27, 1982, three months after the preliminary hearing. The time lapse would ordinarily be sufficient to dissipate any pretrial publicity arising at the preliminary hearing. Furthermore, the defendant failed to introduce evidence in support of his claim of prejudice.

Defendant also contends that the trial court erred in denying defendant's motion for change of venue and also in refusing to appoint an investigator to determine if community prejudice existed. The record shows extensive newspaper publicity, but the defendant produced no affidavits showing community prejudice and the record does not show any unusual difficulty in selecting the jury. The prosecution passed the jury for cause after excusing one person for cause. The defense passed the jury for cause. Three jurors were excused, two for unrelated reasons, and one for having served on a jury within the past year. Defendant made no showing of necessity for the appointment of an investigator to show community prejudice. In *State v. Campbell*, 210 Kan. 265, 500 P.2d 21 (1972), the court stated that the granting or denial of a motion for funds to provide supporting services to an indigent defendant in a criminal action is a matter resting within the sound discretion of the trial court. Its ruling will not be disturbed in the absence of a showing that the exercise of such discretion has been abused to the extent of prejudicing the substantial rights of the defendant. We find no abuse of discretion. Likewise, as to the court's denial of defendant's motion for a change of venue, we find no abuse of discretion under the principles set forth in *State v. Sanders*, 223 Kan. 273, 280, 574 P.2d 559 (1977).

The defendant complains that the trial court erred in consolidating the two criminal cases involving the KU incident and the church incident. K.S.A. 22-3203 provides that the court may order two or more complaints, informations or indictments against a single defendant to be tried together if the crimes could have been joined in a single complaint, information or indictment. This court in *State v. Bagby*, 231 Kan. 176, 177-78, 642 P.2d 993 (1982), stated:

"Joinder in the same complaint or information is proper if the crimes charged: (1) are of the same or similar character, (2) are based on the same act or transaction, or (3) are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan. K.S.A. 22-3202(1)."

Within these guidelines, the decision to consolidate rests within the sound discretion of the trial court and its holding will not be disturbed on appeal, absent a clear showing of abuse of the exercise of that discretion. We have no hesitancy in holding in this case that the trial court did not abuse its discretion in

consolidating the two cases for trial. The evidence in the two cases was similar. The same shotgun was used. Although the victims were different, the motive was the same—the defendant acted for "security reasons." The defendant's *modus operandi* was similar. The defense to both actions was not guilty by reason of insanity. The defense in each case would have been the same regardless of whether there were separate trials. Under the circumstances, we find no error in the consolidation of the cases for trial.

Defendant next maintains that the trial court erred in admitting a prior conviction under K.S.A. 60-455. The prior conviction occurred in 1977 for attempted aggravated assault when the defendant went to the KU Medical Center with a gun and threatened a therapist for the same reason that he went there in March of 1981; he was there to take "security measures." This evidence was clearly admissible to show identity and intent. We find no error in the court's rulings.

Defendant raises several points of claimed error involving rulings of the court at the trial. He claims that the trial court erred in failing to sequester the jury, in admitting into evidence photographs of the victims at the KU Medical Center, in denying the defendant's motion in limine to preclude the prosecutor from using the photographs during his argument, in failing to grant a mistrial because of prosecutorial misconduct in the prosecutor's opening statement, in refusing to grant a mistrial due to prosecutorial misconduct in the cross-examination of defense witnesses, and in denying defendant's motion for an expert to test the murder weapon and the ammunition. We have examined each of these points and find them to be without merit.

The final two points raised involve the defense of not guilty by reason of insanity. This was the basic issue to be determined by the jury in this case, in view of the overwhelming evidence that defendant was the person involved in both incidents. Defendant contends that the trial court erred in failing to direct a verdict in his favor at the close of the case, because the evidence was uncontradicted that defendant did not know the difference between right and wrong at the time of the commission of the acts charged. The defense called four medical witnesses and defendant's natural mother in support of its position that the defendant was legally insane. The only medical expert called on

behalf of the State was a psychiatrist who had examined Boan on August 25, 1980, at the Wyandotte County Mental Health Center. Boan was referred to the Wyandotte County Mental Health Center from the Osawatomie State Hospital on August 20, 1980. It was this expert's opinion that at that time Boan suffered from an explosive personality disorder with chronic social malfunctions. This doctor never examined defendant concerning the incidents of March 20, 1981, and December 9, 1981. He had no professional opinion as to defendant's insanity at the time those incidents occurred.

Defendant called as medical experts, Dr. William Walter Menninger of the Menninger Foundation in Topeka; Dr. Charles Befort, a psychologist from Larned State Hospital; Dr. Ratnam Polavarapu, a psychiatrist from Larned State Hospital; and Dr. Rae Sedgwick, a clinical psychologist from Bonner Springs. A number of lay witnesses testified that Boan was deranged, that he had delusions and distorted reality. The Baptist minister who was assaulted in the church incident had had several previous conversations with Boan. He testified that he had the impression that Boan was a very sick person. The evidence was thus undisputed that defendant had a severe mental illness. Dr. Menninger, in describing Boan's mental illness, testified that Boan had mental aberrations such as a hearing of voices and a preoccupation with certain ideas and concerns that are quite real for him but which to others do not make sense. In his opinion, Boan had a feeling of being God or a representative of God, who was present at the Last Supper, who had been in this world at various times, who had at various times been threatened or attacked by others who had not given him credit for his rightful position. In his judgment, Boan felt that he was being threatened, which prompted the violent behavior in these cases for "security reasons." In Boan's mind, his actions were totally justified. Boan had a mental illness which Dr. Menninger diagnosed as paranoid schizophrenia. Dr. Menninger testified that Boan sensed that other persons were in his body and displaced him, and that some of these people were at the KU Medical Center. Boan felt that he could not tolerate this and had to defend himself from what he described as "salvation level attacks." As to the church incident, it was Dr. Menninger's opinion that Boan felt he rightfully deserved money and respect from the church which he was not

getting. Therefore, Boan needed to eliminate this "sermon giver" (the minister) so that he could arrange for another who would respond and give Boan the money to which he was entitled.

The issue to be determined is whether the evidence presented at the trial *required* the district court to direct a jury verdict of not guilty by reason of insanity. The test for criminal insanity which has been adopted and followed in Kansas, is the so-called "*M'Naghten* Rule." The *M'Naghten* rule was formulated in an advisory opinion of the English judges in *M'Naghten's Case,* 10 Clark & F. 200, 8 Eng. Rep. 718 (1843). That case held that the test of mental responsibility is whether the accused "was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or if he did know it, that he did not know he was doing what was wrong." It is important to note that the *M'Naghten* rule has *two* branches. The accused is to be held not criminally responsible (1) where he does not know the nature and quality of his act, or in the alternative, (2) where he does not know right from wrong with respect to that act.

In applying the *M'Naghten* test to the evidence presented in this case, it is clear from the testimony of the defense experts that at the time defendant Boan committed the acts with which he is charged, he understood and knew the nature and quality of those acts. Dr. Charles Befort testified that at the time of the KU incident, Boan probably was aware of what he was doing and that his actions were intentional. Dr. Polavarapu testified that, on both occasions, the defendant knew he was shooting somebody and that death or personal injury would result therefrom. Dr. Menninger, on direct examination, testified that in both the KU incident and the church incident Boan knew what he was doing and did it quite purposefully and quite directly in terms of conveying a message to the persons present. Furthermore, in his statements given to the police, Boan described clearly and accurately the actions he took on both occasions. In view of this evidence, defendant Boan was not entitled to a directed verdict of not guilty by reason of insanity under the first branch of the *M'Naghten* test.

The second branch of the *M'Naghten* test provides that an accused may not be held criminally responsible where he does

not know right from wrong with respect to his actions. This raises the question whether, under the *M'Naghten* test, "right and wrong" means legally or morally right and wrong. There appears to be a disagreement among some of the jurisdictions on this issue. The judges in *M'Naghten's Case* took the view that the knowledge of right and wrong involved in that test means a knowledge that the act committed was contrary to the law of the land. In response to a question, the judges stated that an act would be punishable according to the nature of the crime committed, although committed in consequence of an insane delusion, if the accused knew at the time of committing the crime that he was acting contrary to the law of the land. Later, in *Regina v. Windle,* [1952] 2 Q. B. 826, [1952] 2 All. E.R. 1 Crim. App., the argument that under the test the term "right and wrong" should be taken in the moral rather than in the legal sense was rejected. The syllabus of the case states as follows:

"Where, in a criminal case, the defence is set up that, owing to disease of the mind, the prisoner did not know that he was doing what was wrong, it must be proved that at the material time he did not know that he was doing what was contrary to the law. It is not sufficient to prove that he believed that, while what he was doing was legally wrong, it was morally right."

This interpretation of the right and wrong test was recognized and applied in *State v. Andrews,* 187 Kan. 458, 469, 357 P.2d 739 (1960). In the opinion, the court cited *Regina v. Windle* and held that the meaning of the word "wrong" as used in the *M'Naghten* test is "that which is prohibited by the law of the land." In considering the evidence in this case, we must, therefore, consider whether there was evidence which raised a factual issue as to whether defendant Boan knew that his actions were contrary to Kansas law at the time they were committed.

Dr. Befort testified at first that he did not know if the defendant knew the difference between right and wrong at the time of the two incidents involved in these cases. He later testified that Boan knows right from wrong and probably knew it then. Specifically, that expert witness testified that Boan knows the moral laws and the laws of the state, knows that it is wrong to shoot somebody, and knows that it is wrong to point a loaded shotgun at a police officer. At another point, the doctor testified that, in his opinion, Boan knew right from wrong on March 20, 1981, and December 9, 1981, but that he thought what he was doing was the right thing on both dates.

Dr. Ratnam Polavarapu testified that, at the KU incident, Boan knew that he was going to shoot somebody and that death or personal injury would result from the shooting. When asked whether Boan knew the difference between right and wrong, the doctor stated that was a vague thing that he could not answer. There was evidence at the trial that the defendant had conversations with the doctors in which he stated that he did not want to go to prison but preferred going to a hospital. When asked if the defendant ever knew right from wrong, Dr. Menninger responded: "The problem with answering that . . . is to define what one means in terms of right and wrong. Because of certain respects, clearly I think he had some awareness of certain things being right and wrong in the ordinary sense of the word. I think that its only been in more recent years that he has become more preoccupied with the religious thoughts and what we would perceive as a religious delusion that he then modified the definition of what was right, according to his belief that he, as God, made the rights."

In *State v. Nemechek*, 223 Kan. 766, 576 P.2d 682 (1978), it is stated:

"There is a presumption of sanity in a criminal proceeding that may be relied upon by the prosecution to establish a prima facie case. (*State v. Coltharp*, 199 Kan. 598, 433 P.2d 418 [1967].) The prosecution is never required to introduce evidence of sanity until some evidence is introduced which, if believed by the jury, could raise a reasonable doubt as to a defendant's sanity at the time the offense was committed. (See, *State v. Penry*, 189 Kan. 243, 368 P.2d 60 [1962]; *Wilson v. United States*, 288 F.2d 121 [D.C. Cir. 1960]; *State v. Clokey*, 83 Idaho 322, 364 P.2d 159 [1961]; *People v. Smothers*, 2 Ill. App. 3d 513, 276 N.E.2d 427 [1971], *aff'd* 55 Ill. 2d 172, 302 N.E.2d 324 [1973].) This evidence may come from either the defendant or the state. (*State v. Johnson*, 92 Kan. 441, 446, 140 Pac. 839 [1914]; *State v. Crawford*, 11 Kan. 32, 45 [1873]; *Davis v. State*, 90 Neb. 361, 133 N.W. 406 [1911]; *Lemke v. State*, 56 Okla. Crim. 1, 9, 32 P.2d 331 [1934].) The term 'evidence,' however, does not include the insanity plea or opening statements. Neither rebuts the presumption of sanity. (*State v. Coltharp*, supra at 602; *State v. Mendzlewski*, 180 Kan. 11, 13, 299 P.2d 598 [1956]; *United States v. Currier*, 405 F.2d 1039, 1042 [2d Cir. 1969], cert. denied 395 U.S. 914, 23 L.Ed.2d 228, 89 S.Ct. 1761 [1969]. *Cf.*, *United States v. Marbley*, 410 F.2d 294 [5th Cir. 1969].) . . .

"The presumption of sanity is rebutted when evidence is introduced which could raise a reasonable doubt concerning a person's sanity. (*State v. Johnson*, supra at 447.) At that point the question of sanity becomes a question for the jury, assisted by proper instructions. (*State v. Johnson*, 223 Kan. 237, 240, 573 P.2d 994 [1977]; *State v. Coltharp*, supra at 603; *State v. Mendzlewski*, supra at 14.) If the

jury has a reasonable doubt as to a defendant's sanity at the time the offense was committed, it is under a duty to acquit the defendant. (*State v. McBride*, 170 Kan. 377, 226 P.2d 246 [1951]; *State v. Nixon*, 32 Kan. 205, 4 Pac. 159 [1884]; *State v. Crawford*, supra at 43.) It is a rare occasion when an insanity question should be taken from a jury by a motion for acquittal. In *State v. Gustin*, 212 Kan. 475, 510 P.2d 1290 (1973), we said:

" 'A trial judge in passing upon a motion for judgment of acquittal must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes guilt beyond a reasonable doubt is a fairly possible result, he must deny the motion and let the jury decide the matter. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion.' (Syl. 3.)

"In *State v. Chase*, 207 Kan. 352, 362, .480 P.2d 62 (1971), we quoted from *Dusky v. United States*, 295 F.2d 743, 756 (8th Cir. 1961), as to the test for acquittal in an insanity defense case:

" ' ". . . [I]n order to remove this case from the jury's consideration, . . . 'reasonable men must necessarily possess a reasonable doubt as to defendant's sanity and . . . reasonable men must conclude that the government has failed to sustain its burden of proving beyond a reasonable doubt that the accused had the capacity to commit the crime.' . . ." '

"Unless evidence of insanity is so great that a trial judge can rule the government could not convince a reasonable man it has sustained its burden of proof as to defendant's sanity, the issue should go to the jury, as we have recommended in the past. (*E.g., State v. Sagebiel*, 206 Kan. 482, 480 P.2d 44 [1971]; *State v. Chase*, supra; *State v. Coltharp*, supra; *State v. Mendzlewski*, supra.)" pp. 767-69.

In *State v. Sanders*, 225 Kan. 147, 151, 587 P.2d 893 (1978), we find the following language:

"It is a rare occasion when an insanity question should be taken from a jury by a motion for acquittal. [Citation omitted.] The test for taking the issue of insanity away from the jury was adopted by this court in *State v. Chase*, 206 Kan. 352, 362, 480 P.2d 62 (1971). In order to remove thé case from the jury's consideration on the basis of the evidence, reasonable men must necessarily possess a reasonable doubt as to defendant's sanity and must conclude that the government has failed to sustain its burden of proving beyond a reasonable doubt that the accused had the capacity to commit the crime. *Dusky v. United States*, 295 F.2d 743, 756 (8th Cir. 1961)."

Having considered the evidence contained in the record in this case, we have concluded that the trial court did not err in its refusal to direct a verdict of not guilty by reason of insanity at the close of the case. An issue of fact existed in the case and, hence, the factual issue of defendant's insanity was properly submitted to the jury.

The final point raised on the appeal is that the trial court erred

in the instruction which it gave on the insanity issue. Instruction No. VI on the insanity issue was as follows:

"Insanity, to constitute a legal defense to the charge of crime, means that the defendant is laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he is doing, or if he did know it, that he did not know that what he was doing was wrong because of his mental inability to distinguish between right and wrong, and if these facts exist, then the law does not hold him responsible for his act. On the other hand, if a defendant is mentally capable of understanding what he is doing and has the power to know that his act was wrong, then the law will hold him criminally responsible for it. If this power of discrimination existed, he was sane in the eyes of the law. A person of sound mind and discretion will not be exempted from punishment because he might have been a person of weak intellect or one whose moral perceptions were blunted or ill developed, or because his mind may have been depressed or distracted from brooding over misfortunes or disappointments, or because he may have been wrought up to the greatest and most intense mental excitement from sentiments of disappointment, rage, revenge, or anger. The law recognizes no form of insanity, although the mental faculties may be disordered or deranged, which will furnish one immunity from punishment for an act declared by the law to be criminal, so long as the person committing the act had the capacity to know what he was doing and the power to know that his act was wrong. *Right and wrong are used here in their legal sense, not the social or moral sense. 'Wrong' means that which is prohibited by the law.*

"If you have a reasonable doubt as to the ability of the defendant to know what he was doing or to distinguish right from wrong at the time of the alleged commission of the act, you should find the defendant not guilty because of insanity." (Emphasis supplied.)

The defendant complains that instead of this instruction the court should have given PIK Crim. 2d 54.10, Insanity—Mental Illness or Defect, which states:

"The defendant has denied criminal responsibility because of lack of mental capacity at the time the offense was committed. In law, this is called insanity. The defendant is not criminally responsible for his acts if his mental capacity was such that he did not understand the nature of his acts or did not understand that what he was doing was wrong because of his mental inability to distinguish between right and wrong.

"If you have a reasonable doubt as to the mental capacity of the defendant at the time of the alleged commission of the offense, then you should find the defendant not guilty because of insanity."

In overruling defendant's objection and request to give PIK Crim. 2d 54.10, the trial court pointed out that, as used in the right and wrong test, the word "wrong" means "that which is prohibited by the law of the land." The trial court noted that the PIK instruction has no definition to inform the jury as to what is

meant by "right and wrong." PIK Crim. 2d 54.10 does not state whether it is a moral judgment, a religious judgment, a social judgment, or a legal judgment. The court observed that it understood the rule to be that so long as an accused knows what he is doing is prohibited by the laws of our state, he can be held criminally responsible. In our judgment, the comments of the trial judge were quite appropriate. In this case, the trial court gave the *Andrews* instruction which was approved in *In re Jones*, 228 Kan. 90, 612 P.2d 1211 (1980), but added the following additional lines:

"Right and wrong are used here in their legal sense, not the social or moral sense. 'Wrong' means that which is prohibited by the law."

PIK Crim. 2d 54.10 would be much clearer to the jury if these two additional lines or comparable language were added at the end of the first paragraph. We hold that the trial court did not err in giving the instruction which it gave on the insanity issue.

We have considered the many issues raised by defense counsel in this case. We have concluded that the trial court did not commit prejudicial error and that the judgment of the district court should be and is affirmed.

HOLMES, J., and COOK, District Judge assigned, not participating.