No. 80,643

STATE OF KANSAS, *Appellee,* v. RICHARD LYNN HEDGES, *Appellant.*

(8 P.3d 1259)

896

Opinion filed July 28, 2000.

*Mary Curtis*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the briefs for appellant.

*Angela M. Wilson*, assistant district attorney, argued the cause, and *Christine Kenney Tonkovich*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Defendant appeals convictions of kidnapping, attempted aggravated arson, aggravated burglary, and attempted voluntary manslaughter, asserting (1) the trial court erroneously instructed the jury on diminished capacity; (2) the evidence was insufficient to sustain the conviction of attempted voluntary man-

slaughter; (3) the trial court erroneously failed to suppress defendant's statements; (4) defendant was incompetent to stand trial; and (5) defendant was denied effective assistance of counsel.

Richard Hedges and Roberta Ingraham were married on June 25, 1991. Roberta had two children from a previous marriage. Roberta and Richard had a son, Lucas, who was born July 14, 1992. They were divorced in 1995. Roberta obtained a protection from abuse order which was in effect on the date the events giving rise to his conviction occurred.

Prior to July 13, 1996, Hedges' attorney contacted Roberta's attorney regarding visitation with Lucas on Lucas' birthday. The protection order prohibited Hedges from visiting Lucas, and Roberta refused to allow visitation. On July 13, 1996, the day before Lucas' birthday, in contravention of the protection order, Hedges went to Roberta's work place in Baldwin City, Kansas. The police were called and Hedges left without incident.

The next day, as Roberta and her children were sitting in front of their home, Roberta observed a man walking quickly along the sidewalk with a box on his shoulder. The box obscured the man's face. As the man approached the house, Roberta recognized him as Hedges. Roberta told her 12-year-old daughter to call the police, as Roberta picked up Lucas and ran toward the house. Roberta's other daughter jumped the fence to obtain help from a neighbor.

As Hedges walked up the driveway, he took bottles out of the box and threw them against the pavement. Hedges kicked open the front yard gate and walked toward the house. Roberta went inside the house, shut the storm door, and put her weight against the solid front door in an attempt to close it. Hedges broke the glass in the storm door and pushed against the front door. While pushing, Hedges reached inside the house and poured gasoline on Roberta. Some gasoline dripped on Lucas. Hedges said to Roberta, "This is gasoline. How do you like this?" Roberta slapped a cigarette out of Hedges's mouth and attempted to push him out of the doorway. Hedges forced his way through the door and stated, "This is my fucking house."

Roberta ran to the bathroom and placed Lucas in the bathtub to wash the gasoline off him. While Roberta was in the bathroom

with Lucas, Hedges proceeded to pour gasoline throughout the house.

Delbert Reed, a neighbor summoned by Roberta's oldest daughter, entered the house and saw Hedges running about pouring gasoline out of small drink containers. Reed observed that Hedges was holding a cigarette lighter, and Hedges told Reed that he was going to blow up the house.

When Reed made a lunge for Hedges, Hedges said, "Don't fuck with me, Delbert, or I'll kill you too." Hedges then threw gasoline on Reed, and made a gesture with the lighter. Hedges shouted that he wanted Channel 6 to come to the scene because he wanted to expose the truth. At that time, a police officer came to the front door and ordered Reed to leave the premises.

Upon his arrival, Officer J. W. Miller of the Lawrence Police Department noted the smell of gasoline and observed Hedges in the house holding several 16-ounce bottles containing liquid. Miller noted that Hedges was upset, agitated, and irate. Hedges told Miller that he had gasoline and warned Miller not to come in the house or he would light the gasoline.

Miller attempted to negotiate the release of Roberta and Lucas. After about 15 minutes, Hedges released Lucas. Shortly after releasing the child, Hedges went into the bathroom with Roberta and shut the door. Miller went to the bathroom door to continue negotiations.

Inside the bathroom, Hedges shredded a 12-roll package of toilet paper, piling the material in the middle of the bathroom floor. He then saturated the toilet paper with gasoline. While holding a cigarette lighter in his hand, Hedges looked at Roberta and asked, "Are you ready to die yet?" Hedges told Roberta to sit on the toilet seat and he sat down on her lap. Roberta then began to console Hedges and he handed Roberta the cigarette lighter.

Miller continued to talk to Hedges through the bathroom door. During their conversations, Hedges repeatedly exhibited mood swings from very calm to extremely irate. Hedges wanted the media to come to the scene; he wanted his counselor; and he wanted Roberta to tell the truth about the divorce.

Hedges' counselor, Jay Pruitt, arrived and assisted the police with the negotiations. After about 50 minutes, Hedges opened the bathroom door a crack. Miller then pushed the door open, turned the bathroom light on, and escorted Roberta outside. Roberta was treated for minor chemical burns caused by the gasoline. After Hedges handed Miller a cigarette lighter, Hedges was taken into custody by law enforcement officers, handcuffed, and then transported to Lawrence Memorial Hospital for a mental screening and treatment of injuries.

At the hospital, Alea Ahmed, a social worker, screened Hedges for potential involuntary commitment. Ahmed asked Hedges a standard battery of questions addressing the statutory criteria for involuntary commitment to a state mental hospital. Ahmed concluded that Hedges was not capable of making informed treatment decisions, was suffering from a mental disease, and was a danger to himself or to others. Ahmed recommended that Hedges be involuntarily committed.

Hedges was not committed, but was arrested and advised of his *Miranda* rights. He agreed to waive his rights and talk to the police. Hedges made incriminating oral statements but declined to make a written statement.

Hedges was charged with two counts of attempted first-degree premeditated murder, aggravated kidnapping, attempted aggravated arson, and aggravated burglary. He was convicted of one count each of kidnapping, attempted voluntary manslaughter, attempted aggravated arson, and aggravated burglary of a residence. Hedges was sentenced to a controlling term of 119 months, which will be reduced by the Secretary of Corrections to 102 months to comply with the statutory requirement limiting the total sentence to twice the base sentence.

## INSTRUCTION ON DIMINISHED CAPACITY

Hedges had three court-appointed attorneys: a pretrial attorney, a trial attorney, and a post-trial attorney. Hedges' first attorney was aware of the applicable defense of "mental disease or defect negating intent." See K.S.A. 22-3219(1). The trial attorney erroneously thought the defense of insanity was applicable. See K.S.A.

22-3219(1) (Ensley 1988). The third attorney appointed to represent Hedges in post-trial matters was aware of the law in effect at the time of the crime.

Although requested by Hedges' trial attorney, the district judge refused to give an insanity defense instruction, but then without objection instructed the jury that diminished capacity may be considered in determining whether Hedges was capable of forming the necessary intent for the crimes charged. Hedges pointed out in his post-trial motions that the instructions given to the jury pertained to the law of diminished capacity as it applied to crimes committed prior to January 1, 1996, and his crimes were committed after that date. Hedges' trial attorney had argued for an insanity defense instruction based on the *M'Naghten* test, (see *State v. Boan*, 235 Kan. 800, 809, 686 P.2d 160 [1984]), which was not applicable at the time of Hedges' crime, and Hedges deferred to the judgment of his trial attorney. Hedges now erroneously claims that at the jury instructions conference his trial attorney had requested an instruction on the law in effect at the commission of the crime and the judge had refused to give the proper instruction. In a post-trial motion prior to sentencing, Hedges asserted that the trial court's failure to instruct on the law applicable to crimes committed after January 1, 1996, was reversible error and denied him the right to present a defense.

In order to understand the problems which plagued the court and the parties as to Hedges' defense, it is necessary to review the statutory changes that have occurred relating to the defenses of insanity, diminished capacity, and mental disease or defect negating intent. Prior to January 1, 1996, there were two defenses relating to mental disease or defect: insanity and diminished capacity.

**Insanity**. Prior to January 1, 1996, Kansas recognized an insanity defense under which criminal insanity was evaluated using the *M'Naghten* test. As explained in Note, Insanity Denied: Abolition of the Insanity Defense in Kansas, 8 Kan. J.L. & Pub. Pol'y 253, 254 (Winter 1999), "Under *M'Naghten*, the defendant should be found criminally insane only if the accused did not know the nature and quality of the act; or, if the accused did know it, where the accused did not know right from wrong with respect to the act."

Under this standard, the defense had the burden of producing evidence to indicate the possibility of insanity, and then the burden shifted to the State to prove the defendant was not insane at the time of the act. *State v. Linn*, 251 Kan. 797, 806-07, 840 P.2d 1133 (1992). Pursuant to K.S.A. 22-3219, not more than 30 days after entry of a plea of not guilty, a defendant who intended to rely on the defense of insanity was required to give notice of such intention before trial. K.S.A. 22-3219(1) (Ensley 1988). By relying on such defense, the defendant thereby submitted himself or herself and consented to orders if the court might require a mental examination. K.S.A. 22-3219(2) (Ensley 1988).

In *State v. Boan*, 235 Kan. at 814, this court emphasized that under the "right or wrong" prong of the *M'Naghten* test, "wrong" means prohibited by law rather than morally or socially wrong. This clarification is reflected in the applicable PIK instruction, PIK Crim. 3d 54.10 (1995 Supp.), which states the test for insanity for crimes committed prior to January 1, 1996.

**Diminished Capacity.** The defense of "diminished capacity" was formally recognized in Kansas in *State v. Jackson*, 238 Kan. 793, 714 P.2d 1368, *cert denied* 479 U.S. 821 (1986). In *Jackson*, this court stated that the defense of diminished capacity was not a substitute for a plea of insanity. Where a defendant is sane, he or she may use the doctrine of diminished capacity for the limited purpose of negating specific intent. Whether to instruct on diminished capacity is within the sound discretion of the trial court. 238 Kan. at 798. In *State v. Maas*, 242 Kan. 44, 744 P.2d 1222 (1987), this court reaffirmed the principles stated in *Jackson* and further suggested that

"it would be better practice for the trial court to give an instruction on diminished capacity where such an instruction is reasonably necessary to inform the jury of the effect of a defendant's diminished capacity on the specific intent required for the crime charged. Until the Pattern Instruction Committee of the Judicial Council has provided such an instruction, an instruction in the following form would be appropriate: 'Diminished mental capacity of the defendant not amounting to insanity is not a complete defense to a criminal charge, but when a particular intent or other state of mind is a necessary element of the offense charged, diminished mental capacity may be taken into consideration in determining whether

the accused was capable of forming the necessary specific intent or state of mind.' "
242 Kan. at 52-53.

The PIK committee eventually published the applicable instruction, PIK Crim. 3d 54.12-B (1999 Supp.), which is a shortened version of the court's suggestion in *Maas*.

**The New "Mens Rea" Approach**. The enactment in 1995 of K.S.A. 22-3220, and corresponding amendments to K.S.A. 22-3219 and other statutes, abolished the "insanity" defense for crimes committed on or after January 1, 1996. See generally, Note, 8 J.L. & Pub. Pol'y 253 (1999). K.S.A. 22-3220 provides:

"It is a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged. Mental disease or defect is not otherwise a defense. The provisions of this section shall be in force and take effect on and after January 1, 1996."

References to the "defense of insanity or other defense involving the presence of mental disease or defect" formerly in K.S.A. 22-3219 were also removed, and the amended statute provides that a defendant who intends to rely on the defense that "as a result of mental disease or defect [he or she] lacked the mental state required as an element of the offense charged" must serve written notice of the defense within 30 days of the defendant's plea of not guilty. See L. 1995, ch. 251, § 25; K.S.A. 22-3219.

The jury instruction applicable for the new mens rea approach to mental disease or defect as a defense, PIK Crim. 3d 54.10 (1996 Supp.), states:

"54.10 MENTAL DISEASE OR DEFECT (For Crimes Committed January 1, 1996 or Thereafter)

"Evidence has been presented that the defendant was afflicted by mental disease or defect at the time of the alleged crime. Such evidence is to be considered only in determining whether the defendant had the state of mind required to commit the crime. You are instructed the defendant is not criminally responsible for (his)(her) acts if because of mental disease or defect the defendant lacked the (set out the particular state of mind which is an element of the crime or crimes charged)."

Although Hedges' crimes were committed after the effective date of the new legislation, the trial court instructed on diminished capacity applicable to crimes committed before January 1, 1996.

At the jury instructions conference, the court, the State, and the defendant's trial attorney operated under the misconception that the old law, on insanity (*M'Naghten*) and diminished capacity, was applicable. The arguments made to the court in support of and in opposition to the insanity defense instruction were phrased in terms of whether there was sufficient evidence that Hedges understood the nature of his acts or whether he understood the difference between right and wrong.

The court denied trial counsel's request for an instruction on a *M'Naghten* insanity defense for several reasons, including (1) the evidence was insufficient under the *M'Naghten* test to send the issue of insanity to the jury and, relatedly, because Hedges' testimony ruled out the insanity defense; and (2) unfair surprise to the State because, despite timely notices of intent to rely on an insanity defense or a mental disease or defect defense, both of which had been given by Hedges' pretrial counsel, Hedges later stated that he did not want to and would not rely on the defense of insanity. It is important to note that Hedges' trial counsel, in opening statement, never informed the jury of an intent to rely on insanity and that after the evidence was submitted, the trial judge refused to give an instruction on the defense of insanity.

After Hedges was convicted by the jury, he expressed dissatisfaction with his trial counsel, who was then replaced by a third attorney. The post-trial attorney realized the instruction error regarding the applicable law for mental disease or defect as a defense. The post-trial attorney filed a motion for new trial, arguing that because the jury had not been properly instructed on the mental disease or defect defense pursuant to K.S.A. 22-3219, Hedges was entitled to a new trial.

Hedges' trial counsel did not request an instruction for mental disease or defect and wrongly argued that a *M'Naghten* insanity defense instruction was appropriate. Because an insanity defense was no longer applicable, the judge's failure to give the requested insanity instruction was not error.

The effect of giving the inapplicable diminished capacity instruction is a different question. We note that there was no objection made to the diminished capacity instruction given by the trial court.

In such circumstances, no party may assign as error the giving of an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of his or her objection, unless the instruction is clearly erroneous. K.S.A. 22-3414. Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Henry*, 263 Kan. 118, 131, 947 P.2d 1020 (1997).

Under the new mental disease or defect statute, evidence of mental illness is admissible only to the extent it relates to the defendant's ability to form the requisite intent to commit the crime. The court's instruction was actually beneficial to Hedges; he was given the possibility of an additional defense he was not entitled to receive under the law applicable to his case. Even if Hedges suffered from a mental disease or defect, there was no evidence that mental disease impaired Hedges' ability to form the requisite intent of the crimes. Furthermore, the instruction was not clearly erroneous. The substance of the diminished capacity instruction given and the proper mental disease or defect instruction focus on the defendant's ability to form intent. Therefore, the trial court's instruction to the jury was not reversible error. The district court correctly denied the defendant's post-trial motion for a new trial.

## SUFFICIENCY OF EVIDENCE

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Johnson*, 266 Kan. 322, 326, 970 P.2d 990 (1998).

### *Intent*

Hedges argues the evidence introduced at trial regarding his intentional state of mind pertained to his intent to commit the crime of arson rather than the crime of attempted voluntary manslaughter. Hedges asserts the evidence was insufficient to sustain

the conviction of attempted voluntary manslaughter because there was no evidence that he intended to kill Roberta.

Hedges stated to the police and at trial that he did not intend to kill Roberta when he made preparations to burn the house. However, contrary to his statements regarding intent, when Hedges arrived at home and found Roberta there, his acts and his comments to Roberta and others evidenced an intent to kill sufficient to sustain the conviction of attempted voluntary manslaughter.

### Overt Act

Hedges also asserts that to prove attempted voluntary manslaughter, the State must show an overt act toward the commission of that crime. Hedges argues he made no overt act toward the perpetration of manslaughter.

Hedges' argument as to the sufficiency of the evidence of attempted voluntary manslaughter focuses on whether his acts of pouring gasoline through the house, piling toilet paper on the floor of the bathroom, saturating the pile of toilet paper with gasoline, holding out a cigarette lighter, and pouring gasoline on Roberta and asking her if she was ready to die are overt acts toward the commission of voluntary manslaughter. Hedges asserts these acts constitute the offense of attempted arson and assault but not attempted voluntary manslaughter.

Kansas has no definitive rule as to what constitutes the overt act for the attempt of a crime. The overt act necessarily must extend beyond mere preparations made by the accused and must approach sufficiently near to the consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. *State v. Zimmerman*, 251 Kan. 54, 60, 833 P.2d 925 (1992).

K.S.A. 21-3301 provides, in part:

"An attempt is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof *or is prevented or intercepted in executing such crime.*" (Emphasis added.)

The jury was instructed that to establish the charge of attempted voluntary manslaughter of Roberta, the State must have proved

that Hedges performed an act toward the commission of voluntary manslaughter, that he did so with the intent to commit the crime of voluntary manslaughter, and that he failed to complete *or was prevented from completing commission of the crime of voluntary manslaughter.* Hedges argues that to constitute attempt to commit voluntary manslaughter under these circumstances, he would have had to start a fire from which Roberta escaped death.

Hedges' argument ignores the provision in the statute that to prove attempt, the State may show that the person committing overt acts toward the commission of the crime was "prevented or intercepted" in executing the crime. If Hedges had poured and spilled gasoline throughout an unoccupied house, his acts would have constituted an attempt to commit arson. Here, Hedges prepared the house for ignition and threatened Roberta and a neighbor with death by fire. When the police and Hedges' mental health counselor arrived on the scene, negotiations began and Roberta was eventually released. An intervening act, *i.e.*, the arrival of law enforcement officers, prevented Hedges from committing the crime of voluntary manslaughter. There was sufficient evidence to sustain the conviction of attempted voluntary manslaughter.

## HEDGES' STATEMENTS

Hedges was not advised of his *Miranda* rights at the hospital where he gave statements to the social worker who screened him for involuntary commitment in the presence of police officers. Hedges was advised of his *Miranda* rights when he was later questioned by officers at the police station. After being advised of his right to remain silent, Hedges said, "I don't know if that is the right thing to do." The officer informed Hedges that he could not give Hedges legal advice. Hedges then stated, "I will waive my rights." The officer asked Hedges if he understood his *Miranda* rights. Hedges stated he did, and questioning commenced. Hedges stated to the officers that he had no intention of killing Roberta, but his intention was to burn the house down.

Prior to trial, defense counsel moved to suppress the statements Hedges made to the social worker at the hospital and his later statements made to law enforcement officers at the Douglas

County jail. The trial court determined that the statements Hedges made to the social worker at the hospital prior to being advised of his *Miranda* rights were not admissible. The trial court then concluded that, after Hedges was advised of his *Miranda* rights at the Douglas County jail, he knowingly and voluntarily waived those rights. The court denied Hedges' motion to suppress the statements made at the jail to the officers.

Hedges first contends the statements he made at the county jail were tainted by the prior statements he made at the hospital. Hedges then argues that due to his mental state, his waiver of his *Miranda* rights was not knowing and voluntary.

### Taint of Prior Statements

The Fifth Amendment prohibits only the use of compelled testimony. *United States v. Wiley*, 997 F.2d 378, 383 (8th Cir.), *cert. denied* 510 U.S. 1011 (1993); *State v. Dang*, 267 Kan. 198, 207-08, 978 P.2d 277 (1999). A noncoercive *Miranda* violation does not automatically taint post-*Miranda* statements. *Oregon v. Elstad*, 470 U.S. 298, 305-09, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985). Though *Miranda* requires the suppression of an unwarned admission, the admissibility of any subsequent statement turns solely on whether the statement was knowingly and voluntarily made. 470 U.S. at 309. Absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights. 470 U.S. at 314.

Hedges' assertion that his statements at the county jail were tainted by his prior statements at the hospital assumes that the statements at the hospital were the result of coercive or improper tactics. The record contains no suggestion of coercion. We note the social worker asked Hedges if he wanted the officer to leave

the room during questioning, and Hedges responded that it was fine if the officer stayed.

Since Hedges' prior statements to the social worker were not admitted into evidence or the result of government coercion, those statements did not affect the admissibility of his subsequent statements to the officers.

## Voluntariness of Subsequent Statements

Hedges contends that at the time he confessed to the officers at the county jail, he was not capable of making a rational and intelligent choice to waive his rights. He asserts that he was under the influence of extreme mental disturbance characterized by distorted and disorganized thought.

Waiver of *Miranda* rights must be knowing, voluntary, and intelligent under the totality of the circumstances. The burden of proving a voluntary waiver of rights is on the State. *State v. Esquivel-Hernandez*, 266 Kan. 821, 825, 975 P.2d 254 (1999). Factors to be considered in determining whether a confession is voluntary include: (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect and background; and (5) the fairness of the officers in conducting the investigation. *State v. McCorkendale*, 267 Kan. 263, 270, 979 P.2d 1239 (1999). The absence of police coercion or duress does not foreclose a finding of involuntariness. See *State v. William*, 248 Kan. 389, 407-08, 807 P.2d 1291, *cert. denied* 502 U.S. 837 (1991) (citing *Colorado v. Connelly*, 479 U.S. 157, 93 L. Ed. 2d 473, 106 S. Ct. 515 [1986]).

Voluntariness of a confession is determined from the totality of the circumstances, and where a trial court conducts a full prehearing on the admissibility of extrajudicial statements by the accused, determines the statements were freely and voluntarily given, and admits the statements into evidence at trial, appellate courts accept that determination if supported by substantial competent evidence and do not attempt to reweigh the evidence. *McCorkendale*, 267 Kan. at 270-71.

At the county jail, Hedges was upset, but he had no problem communicating. In response to questions by law enforcement officers, he recounted the events leading up to and during his siege of Roberta's house. Hedges explained that he blamed Roberta for the fact that he had not been able to visit his son. Hedges assumed Roberta's house would be empty on July 14, 1996, because Roberta's daughters had a softball tournament that evening. Hedges was not aware that the family was at home until he saw them sitting on the front lawn.

At the conclusion of Hedges' oral statements, the interviewing officer requested Hedges to make a written statement. Hedges began to write, and then stated that he was tired and did not wish to complete the statement. Hedges then requested an attorney, and the officers terminated the interview.

At trial, the officer who interviewed Hedges testified that during the interview Hedges became agitated about his ex-wife and the "system." The officer stated that during this period, Hedges' speech was coherent. The interview lasted an hour and a half. Hedges was provided with something to drink during the interview. Hedges did not appear to be under the influence of alcohol or drugs.

Hedges made no allegation of police coercion. There was no evidence presented that Hedges was incapable of understanding his rights. The trial court observed that Hedges indicated to the officers that he understood his rights, Hedges' answers were responsive, and Hedges terminated the interview by requesting an attorney. The court determined that these facts indicated that Hedges gave a knowing and voluntary waiver of his right to remain silent. We agree. There was substantial competent evidence to support the trial court's decision to admit the post-*Miranda* statements.

## COMPETENT TO STAND TRIAL

Hedges was evaluated twice for competency. Hearings were held after both evaluations, and Hedges was found to be competent to stand trial both times. Hedges contends that the judge's decision

that he was competent to stand trial was erroneous and against the clear weight of the evidence.

### First Competency Evaluation

Hedges' pretrial defense attorney filed a motion to determine Hedges' competency on July 26, 1996. Counsel's motion stated that Hedges had been diagnosed as manic depressive and had been prescribed Lithium and two anti-depressants. The attorney explained that Hedges had stopped taking his medications two months prior to the crimes charged. The attorney stated that Hedges believed he was not suffering from an organic mental illness, did not need medication, and had been erroneously diagnosed. The motion further stated that Hedges had an unshakable belief that his primary defense to the charges was that his wife had lied at the divorce hearing. The pretrial attorney had determined that the most obvious defense to the charges was mental illness. Hedges, who believed he was not mentally ill, refused to permit the defense.

The judge ordered a competency evaluation. A report was filed by Tom Bates, clinical psychologist at Bert Nash Community Mental Health Center. The report concluded that Hedges understood the charges against him and the potential punishment associated with each charge. The report stated that Hedges did not understand that his motivation for the acts charged did not justify his actions. The report concluded that although his defense attorney might experience difficulty in interacting with Hedges, Hedges was competent to stand trial.

In August 1996, the trial court held a hearing on the motion to determine competency. Hedges' testified that he would defend his actions with evidence of the past writings of his ex-wife and the things she had said against him. He stated that his ex-wife had ruined his reputation; therefore, his ex-wife's wrongs justified his action.

The clinical psychologist who examined Hedges testified that Hedges did not understand that his motivation for committing the crimes was not justification for his actions. The psychologist ex-

plained that although Hedges wanted to focus on his ex-wife's actions rather than his own actions, he did understand the difference.

The judge questioned Hedges regarding his understanding of the legal proceedings. Hedges demonstrated an understanding of the purpose of the trial and the role of the attorneys. He understood that he could call witnesses and could not be compelled to testify against himself. He acknowledged that he, through his attorney, and the prosecutor had the right to cross-examine witnesses. Hedges also understood that he was presumed to be innocent. When the judge asked Hedges if he understood that the judge was the final authority as to what evidence would be admitted and that the admission of evidence would be based on relevance, Hedges asked for clarification. After a further explanation by the judge, Hedges stated that he understood but was still adamant that he wanted letters written by Roberta to be admitted into evidence. Hedges stated that in the letters, Roberta said bad things about him, and he would "put [Roberta's] hand on the Bible and she'd say it ain't true."

Hedges' defense attorney argued that the fact Hedges wanted to present an irrational defense showed that the client was hindering, rather than assisting in, his defense. The judge concluded that Hedges was competent to stand trial.

### Second Competency Evaluation

In November 1996, Hedges' attorney again raised the issue of competency and repeated his assertion that Hedges' fixed and unshakable belief that he had a battered spouse defense to the charge, showed Hedges to be incompetent. Hedges' insistence on pursuing an illusory defense had caused his relationship with his defense attorney to deteriorate to the point the two could no longer communicate.

The judge ordered a second evaluation, to be conducted at Larned State Hospital. The evaluation order used the statutory definition of competency: the inability to understand the nature and purpose of the proceedings against him or to make or assist in making a defense. The order stated that in making the determination of competency, the evaluator should consider (1) Hedges'

ability to appreciate whether the defense he chooses is legally allowed or logically consistent with reality, (2) Hedges' ability to participate without disruption at trial and make reasonable assessments of what course is best for his future, and (3) Hedges' ability to understand plea negotiations. The second evaluation concluded that although Hedges would not cooperate with his attorney, he was competent to stand trial.

On February 18, 1997, the judge again found Hedges competent to stand trial. The judge then observed that although the court-appointed attorney had properly represented his client, a grave communication problem affecting the assistance of counsel existed. The judge discharged the first court-appointed attorney and appointed a second attorney to represent Hedges.

## Analysis

A person is incompetent to stand trial when he or she is charged with a crime, and, because of mental illness or defect, is unable to understand the nature and purpose of the proceedings against him or her or unable to make or assist in making a defense to the charge. K.S.A. 22-3301(1). The party who raises the issue of competence to stand trial under the provisions of K.S.A. 22-3302 has the burden of going forward with evidence, and such evidence will be measured by a preponderance of the evidence standard. There is a presumption that the defendant is competent to stand trial. *State v. Barnes*, 263 Kan. 249, 262, 948 P.2d 627 (1997).

The district judge relied upon two professional evaluations to determine if Hedges was competent to stand trial. Each evaluation found Hedges competent to stand trial. The district judge also questioned Hedges as to his understanding of the proceedings, the plea negotiation process, his rights and the presumptions in the case, his right to testify or not to testify, and of what legal defenses were available to him. The judge was satisfied that Hedges understood the charges, recognized the purpose of the trial and the nature of the proceedings, and, if Hedges desired, was able to assist in making a defense. It cannot be said that the district judge erred in finding Hedges competent to stand trial.

### EFFECTIVE ASSISTANCE OF COUNSEL

After trial, Hedges filed a motion to have his trial counsel removed. Hedges alleged a number of areas where he believed counsel's trial performance was deficient. The court heard the motion on May 21, 1997, and, because of the conflict between the defendant and his trial attorney, the judge removed the second appointed attorney. A third attorney was appointed to represent Hedges in post-trial matters. The trial court then had several hearings on post-trial motions.

Hedges contends that he was denied effective assistance of counsel because (1) neither his pretrial attorney nor his trial attorney thoroughly investigated or presented the proper mental defense, and (2) in contravention of his express wishes, both counsel had asserted a mental defense.

Before counsel's assistance is determined to be so defective as to require reversal of a conviction, defendant must establish (1) counsel's performance was deficient, which means counsel made errors so serious that counsel's performance was less than that guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense, which requires showing counsel's errors were so serious they deprived defendant of a fair trial. Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel must be highly deferential. To show prejudice, the defendant must show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. *State v. Rice*, 261 Kan. 567, 598-602, 932 P.2d 981 (1997).

#### Failure to Present a Mental Defense

Hedges' first two attorneys repeatedly advised Hedges to pursue a mental defense. Hedges refused, maintaining that his actions were defensible because of Roberta's lies and misdeeds in the divorce action. Hedges now asserts had he been aware that the statutory defense had changed from "insanity" to "mental defect or

disease," he would have instructed his trial attorney to present that defense.

Hedges, who was found to be competent to stand trial, had the right to determine whether to pursue a mental defense. See *State v. Smith*, 16 Kan. App. 2d 478, 480, 825 P.2d 541 (1992) (citing Kansas Rule of Professional Conduct 1.2[a] [1999 Kan. Ct. R. Annot. 291]) (a defendant in a criminal case has the ultimate authority to determine how to plead). Hedges refused to permit his attorneys to assert an insanity (mental defect) defense. Under the circumstances, the attorneys were required to defend the case accordingly. Hedges did not object to the instruction on diminished capacity. The jury determined that Hedges was not suffering from diminished capacity at the time of the crimes. The trial judge refused to instruct the jury on insanity. The evidence was insufficient to instruct the jury on insanity; it was also insufficient to instruct on a mental defect or disease defense. Hedges' attorneys were not ineffective for failing to assert a mental disease defense.

### Failure to Adequately Investigate Mental Defense

Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *State v. Orr*, 262 Kan. 312, 327, 940 P.2d 42 (1997) (quoting *Strickland v. Washington*, 466 U.S. 668, 691, 80 L. Ed. 2d 674, 104 S. Ct. 2052, *reh. denied* 467 U.S. 1267 [1984]). Hedges contends his attorneys' failure to investigate and explain the mental defenses available precluded him from making an informed decision regarding whether to pursue a mental defect defense.

Hedges' pretrial attorney zealously advocated a mental defense, requested funds to hire an expert, and filed a notice of intent to assert a "common law insanity defense." Based on this notice, the State conducted a mental examination. Hedges opposed the examination, refused to sign the necessary medical records waivers, and caused the pretrial attorney to be discharged because of his objections.

Although the trial attorney was aware that Hedges would not permit a mental defense, the attorney suggested the mental defense on numerous occasions. Hedges continued to assert that he wanted to use the trial as a forum to expose his ex-wife's transgressions. After evaluating Hedges' records and evaluations, trial counsel concluded that a mental defense would not be successful because no expert would testify that Hedges was unable to form the intent necessary to commit the crimes charged.

Applying deference to counsels' judgment, Hedges' opposition to an investigation into his mental illness together with counsels' evaluation that Hedges' mental illness did not impair Hedges' capacity to form the requisite intent support counsels' decision not to further investigate. Hedges was not denied effective assistance of counsel based on counsels' failure to thoroughly investigate a mental defense.

### Knowledge of Applicable Law

Hedges also contends that he was denied effective assistance of counsel because his trial counsel was not aware of the applicable law regarding the mental disease or defect defense.

It is clear that the pretrial attorney was aware that the statutory insanity defense had been abolished and replaced with a mental disease or defect mens rea defense—he filed an intent to rely on the new defense, specifically articulating the requirements of the new law. Hedges' trial attorney, the State's attorney, and the trial judge, however, did not utilize the applicable mental disease or defect law.

At the jury instructions conference, the trial attorney argued for the "insanity" defense and, after the evidence had been submitted at trial, without objection, permitted the court to instruct on diminished capacity which was no longer the law. The jury heard the instruction, weighed the evidence, and determined Hedges had the capacity to form the intent and was not entitled to the defense.

Considering the evidence, even if the proper instruction had been submitted the result of the trial would not have been different. Therefore, Hedges' has failed to show that he was prejudiced by his trial attorney's misunderstanding of the applicable law.

### Assertion of Mental Defect Defense

Hedges also contends he was denied effective assistance of counsel because his attorneys presented a mental defect defense over his opposition.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to conduct his own defense. *Faretta v. California*, 422 U.S. 806, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975). A criminal defendant who is competent is entitled to decide whether to assert the defense of lack of criminal responsibility. *Treece v. State*, 313 Md. 665, 673-81, 547 A.2d 1054 (1988) (relying on *Faretta*, 422 U.S. at 834.). In *State v. Rambo*, 10 Kan. App. 2d 418, 699 P.2d 542, *rev. denied* 237 Kan. 888 (1985), the Court of Appeals affirmed the district court's decision not to impose an insanity defense *sua sponte* over defendant's objection.

The decision whether to assert an insanity defense is different from tactical decisions which are for defense counsel to make. Defenses such as self-defense, coercion, entrapment, and consent share with the defense of insanity the common element of an admission that the defendant did the charged acts. The distinction lies in the result of prevailing with an insanity defense. With the other defenses, the defendant would go free. If the defense of insanity prevailed, there would be a strong likelihood that the result would be indefinite commitment of the defendant.

Since Hedges was competent to stand trial, asserting an insanity defense over his objection would have violated his Sixth Amendment right. The question is whether Hedges' counsel actually asserted a mental defense.

It is undisputed that Hedges' attorneys thought that Hedges was affected by his mental illness when he committed the crimes. It is also clear that his attorneys were doubtful that Hedges' mental illness reached the level or was of a character sufficient to absolve Hedges of criminal responsibility for his actions. Because Hedges opposed the assertion of a mental defect defense and because of the attorneys' doubts regarding applicability of the defense, Hedges' counsel did not have Hedges examined by an expert to testify in support of the defense.

Under the circumstances, Hedges was not denied effective assistance of counsel.

Affirmed.