No. 90,120

STATE OF KANSAS, *Appellee*, v. STEVEN PETERMAN, *Appellant*.
(118 P.3d 1267)

Opinion filed September 9, 2005.

*Michael S. Holland*, of Holland and Holland, of Russell, argued the cause, and *Michael S. Holland II*, of the same firm, was with him on the brief for appellant.

*Keith E. Schroeder*, district attorney, argued the cause, and *Phill Kline*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: The State of Kansas petitioned this court to review the Court of Appeals' reversal of defendant Steven Peterman's conviction of attempted rape for insufficient evidence. The State argues that there was sufficient evidence to support Peterman's conviction of attempted rape.

On September 7, 2001, after drinking wine coolers and beer, Donna Davis and her sister-in-law went to a club. Davis met Peterman at the bar that night. After Peterman bought Davis and her

sister-in-law a drink, Peterman and Davis discussed making money from pornography on the internet. The discussion turned to child pornography. Davis, who was offended by Peterman's statements that he wanted to take pornographic pictures of little girls, continued the conversation to determine if Peterman was serious. When asked, Davis informed Peterman that she could provide him with young girls. Peterman promised Davis if she provided him with young girls, they would make a lot of money. So Peterman could later contact her, Davis gave Peterman her pager number.

Two weeks later, Peterman paged Davis and asked if Davis had any little girls for him to have sex with and photograph that night. Davis lied to Peterman and told him that she had a 10-year-old girl with her. In response to Peterman's inquiry about what the child looked like, Davis described her 9-year-old niece who was having a birthday party that day. Peterman wanted to come to Davis' house, but Davis explained that they could not get together with the child until after the child's birthday party. Davis told Peterman to call her back in 30 minutes so she could make arrangements for him to get the child.

After her telephone conversation with Peterman, Davis called the police and explained the situation to them. The police officer requested that Davis put the meeting with Peterman off until the next day. Davis informed the officer that Peterman had insisted on doing it that night. The police told Davis they needed some evidence before they could act. The officer advised Davis to give Peterman the address of her location.

Peterman called Davis back about 20 minutes after their first telephone conversation. Davis gave Peterman her brother's address and directions to his apartment. Peterman asked if the little girl was there. Davis stated that she was. Peterman informed Davis he would be there in about 20 minutes.

After this conversation with Peterman, Davis again called the police and informed them that Peterman was on his way to her brother's apartment. While Davis was on the phone with the police, Peterman drove up and parked beside Davis' brother's apartment. Davis' niece and some other children were playing outside the apartment when Peterman drove up. Davis' sister-in-law immedi-

ately went outside and took the children into the apartment. Davis hung up the phone and joined Peterman in his truck. Davis' brother then called the police and kept the police informed of the situation.

While they were sitting in the truck, Peterman asked about the little girl. Davis explained to him that the little girl was in the house at her birthday party. Peterman said that he wanted to take the girl then. Davis again explained that she could not interrupt the birthday party because people would ask questions. Davis then convinced Peterman to wait until after the birthday party and promised to bring the little girl to meet Peterman at a motel.

While Peterman and Davis were seated in the truck discussing their plans to meet, Peterman described in detail what he wanted to do with the little girl. The plan included drugging the young girl, penetrating her vagina with a vibrator, and finally having sex with the girl. After this discussion, Peterman opened his briefcase and showed Davis various dildos, vibrators, sex creams, and condoms. Peterman then exhibited to Davis photographs of naked little girls, explained the pictures to her, and stated he had sex with the girls. While sitting in the truck, Davis held Peterman's pictures so her brother could observe them through the apartment window. Davis' brother, who was on the phone with the police, informed them about the pictures.

While Davis was still in Peterman's truck, two police cars approached; one parked in front of Peterman's truck and the second parked behind Peterman's truck. When the police arrived, Peterman put his briefcase under a jacket in the backseat. Davis informed the police that there were pictures in the briefcase.

The police told Peterman to get out of the truck and then advised him of his *Miranda* rights. Peterman told the officers they could search his truck but that they could not search the black briefcase because the briefcase contained items "that could get [him] in trouble." After admitting to the officers that he had obtained photographs of the young children from the internet, Peterman consented to a search of his briefcase.

The police then searched the truck and the briefcase. Inside Peterman's truck, officers found a paper sack containing an empty

case for a dildo, a receipt showing that a dildo had been purchased that afternoon, a flyer for kids night at Skateland Center, and a black briefcase. The briefcase contained pornographic pictures of children, a pair of black women's panties, vibrators, dildos, a bottle containing "Climax Personal Lubricant," a bottle containing an unidentified liquid, bottles of massage oil, a container of ginseng powder, two gold balls, a set of metal clips with a chain, condoms, skin care lotion, "China Shrink Cream," "Hard-on Cream," a jar of spermicidal lubricant, and a bottle of liquid "Spanish Fly." Peterman stated to the officers that he had planned to take photographs of himself having sex with the child and would have used the items in his briefcase on the child.

The State charged Peterman with multiple counts, including attempted rape and solicitation. Several of the charges were dismissed at the preliminary hearing. Peterman was ultimately tried for and convicted by a jury of attempted rape, solicitation to commit rape, and solicitation to commit sexual exploitation of a child. The district judge sentenced Peterman to a controlling sentence of 144 months in prison, ordering the aggravated sentences for all three convictions to run consecutively. Peterman appealed his convictions to the Court of Appeals, claiming insufficient evidence and a multiplicity of charges and convictions and asserting that the district court erred in refusing to suppress evidence.

A majority of the Court of Appeals affirmed Peterman's convictions for solicitation to commit rape and solicitation to commit sexual exploitation and reversed his conviction for attempted rape. *State v. Peterman*, No. 90,120, unpublished opinion filed August 20, 2004. Both the State and Peterman filed petitions for review. We granted the State's petition and denied Peterman's petition.

The State claims that the majority of the Court of Appeals erred when finding there was insufficient evidence to support Peterman's conviction for attempted rape. Peterman had asserted that because he was never in close physical proximity with the purported child victim, there was no overt act sufficient for a conviction for attempted rape. Peterman argued that his actions were mere preparation because the final plans had not been completed and the intended victim was fictional. When the sufficiency of evidence is

challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Zimmerman*, 251 Kan. 54, 58, 833 P.2d 925 (1992).

Attempt is statutorily defined as "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-3301. K.S.A. 2004 Supp. 21-3502(a)(2) defines rape as "sexual intercourse with a child who is under 14 years of age." Sexual intercourse is defined as "any penetration of the female sex organ by a finger, the male sex organ or any object." K.S.A. 21-3501(1). Therefore, to convict Peterman of attempted rape, the State was required to prove that Peterman (1) performed an overt act toward penetrating the sexual organ of a female child under the age of 14; (2) performed that act with the intent to penetrate the sexual organ of a female child under the age of 14; and (3) failed to penetrate the sexual organ of a female child under the age of 14. See P.I.K. Crim. 3d 55.01. The second two elements are not disputed by Peterman and require little discussion.

We have previously stated that the intent required for an attempt to commit a crime must be specific to the underlying crime. *State v. Robinson*, 256 Kan. 133, 137, 883 P.2d 764 (1994). Here, there is ample evidence of Peterman's intent to penetrate a child's vagina. Peterman explained to police that he was going to use the vibrators and dildos in his briefcase on the child. Peterman told Davis in detail how, prior to having sex with the little girl, he would initially penetrate the child's vagina with the smallest vibrator that he had purchased shortly before he met with Davis. Peterman argues that he could not actually penetrate the child because in this case, the child was fictional, *i.e.*, did not actually exist, and the police arrested him while he was merely discussing the matter with Davis.

Did Peterman commit an overt act toward penetrating a female child's sex organ? Kansas law does not provide definitive rules as

to what constitutes an overt act for attempting crime. The overt act necessarily must extend beyond mere preparations made by the accused and must approach sufficiently near to the consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. *State v. Hedges*, 269 Kan. 895, 905, 8 P.3d 1259 (2000).

The intent to commit the crime of rape rather than the possibility of success determines whether the defendant's act constitutes the crime of attempt. *State v. Martens*, 274 Kan. 459, 466, 54 P.3d 960 (2002). We have previously determined that the crime of attempted rape does not require evidence of attempted penetration. *State v. Gonzales*, 245 Kan. 691, 698, 783 P.2d 1239 (1989). Although the overt act does not have to be the last proximate act in the consummation of the crime, it must be either the first or some subsequent step in a direct movement toward the commission of the crime after the preparations are made. *Hedges*, 269 Kan. at 905. Mere preparations include "devising or arranging the means or measures necessary" for committing the offense. *State v. Garner*, 237 Kan. 227, 239, 699 P.2d 468 (1985). It may be enough for the defendant to arrive at the scene where the crime is to occur. 237 Kan. at 238-40 (holding that the defendant committed an overt act toward the crime of attempted theft when he went to the owner's property to prepare the cattle for shipment the next day).

Each case is dependant on its particular facts and the reasonable inferences the jury may draw from those facts. *Garner*, 237 Kan. at 238. It is the jury's function to determine whether an overt act occurred. *State v. Chism*, 243 Kan. 484, 490, 759 P.2d 105 (1988). In reaching its conclusion, the majority of the Court of Appeals did not rely on Peterman's close physical proximity argument. Rather, the majority focused on the incomplete arrangements for completing the act, stating: "Where arrangement of the means or measures necessary to commit such acts are clearly incomplete, we cannot reasonably conclude that Peterman had taken the first step toward intercourse." *Peterman*, slip op. at 10. The majority noted that the line between preparation and overt act may be indistinct and determined that where there is not yet a victim or a place or

time established for the sexual intercourse, that line has not been crossed. Slip op. at 10.

The majority of the Court of Appeals accepted Peterman's argument that there could be no crime because there was no actual victim; here the victim was fictional. We note that this conclusion is contrary to K.S.A. 21-3301(b), which provides: "It shall not be a defense to a charge of attempt that the circumstances under which the act was performed or the means employed or the act itself were such that the commission of the crime was not possible."

The concurrence and dissent observed:

"The majority adopts Peterman's arguments that 'he had no place or time established for the crime; he had never spoken to, seen or met the victim; he did not restrain the victim; he did not disrobe the victim; he did not disrobe himself in preparation for the victim; he did not touch or fondle the victim; and he certainly did not attempt to penetrate the victim.' In doing so, they find the preparations incomplete and determine that 'where there is not yet a victim nor a place and time established for sexual intercourse' the jury could not permissibly find an overt act. They also suggest, citing K.S.A. 21-3303(c), that Peterman would have had an opportunity to abandon his plan and renounce his intention prior to completing the act." *Peterman*, slip op. at 4-5 (District Judge David L. Stutzman, assigned, concurrence and dissent).

The concurrence and dissent then points out:

"In Peterman's view, however, there *was* a victim. The fictional nature of that victim, as the majority holds, is immaterial, as that is an argument based on impossibility. Based on the evidence, Peterman had effectively determined that the time for the crime was to be as soon as possible. Davis' testimony was clear that Peterman came to the house not just to 'observe the child' but to pick up the child and that he asked Davis more than once if he could leave with the child. When Davis first called the police, the officer asked whether she could put Peterman off until the following day to give the police time to prepare; she told the officer that Peterman was insisting on that day. The place for the crime apparently was to be a motel, since that is where Peterman told Davis he intended to go. There was no evidence that Peterman showed any indecision about where he would accomplish the plan he had fully formulated, and there was no suggestion that, 'but for' a possible location, his plans would be complete.

"The fact that Peterman still could have changed his mind and abandoned all purpose to commit the crime does not affect the overt act analysis, since that could be said of many or most defendants charged with attempt crimes, whose overt acts were first or subsequent, but not final, steps toward completing their

crimes. K.S.A. 21-3303(c), the voluntary renunciation defense to criminal solicitation, is not instructive in this context." Slip op. at 5-6 (concurrence and dissent).

The concurrence and dissent concluded:

"The jury in this case was clearly aware that the required elements of the attempted rape charge included an overt act, as reflected by its question asking for a 'better definition of an "overt" act.' The trial judge responded appropriately and the jury resumed deliberations, eventually convicting Peterman on that count. Their decision should be respected. The majority writes that affirming this conviction would show we are being 'influenced by our sensibilities rather than the letter of the law.' I respectfully disagree. Affirming this conviction would let the members of the jury, who saw the witnesses and defendant and heard the evidence, decide the distinctly factual question of whether Peterman's preparations were complete and he had begun to act on his clearly stated intent.

"I would affirm the conviction for attempted rape." Slip op. at 6 (concurrence and dissent).

In *State v. Jones*, 271 Kan. 201, 21 P.3d 569 (2001), this court addressed whether a defendant could be found guilty of attempted indecent liberties with a fictional 14-year-old girl created by a Wichita police officer in response to the defendant's internet personal advertisement. Noting that K.S.A. 21-3301(b) codified the existing law that *factual* impossibility to commit a crime is not a defense and eliminated the doctrine of *legal* impossibility as a defense, the *Jones* court upheld the defendant's conviction. 271 Kan. at 203, 205.

The majority of the Court of Appeals attempts to distinguish *Jones* because there a female police officer posed as a victim, albeit an imposter, thereby associating an actual person with the fictional identity of the victim. *Peterman*, slip op. at 7-8. However, that distinguishing fact does not change K.S.A. 21-3301(b), which eliminates both factual and legal impossibility as a defense. Moreover, *Jones* cannot be factually distinguished in that regard. Like the defendant in *Jones*, there is evidence that Peterman could have associated an actual child with the fictional child Davis described to him. Though not dispositive of this case, Davis testified that she described her niece to Peterman. Davis' niece was outside when Peterman drove by Davis' brother's apartment. Davis asked Peterman if he had seen the girl before she went inside, and he said that he had seen her, but did not get a "good look at her." Thus,

*Jones* precludes Peterman's argument that he could not have committed attempted rape against a fictional victim. The Court of Appeals' conclusion to the contrary is in error.

Peterman's argument that he did not commit an overt act because he was not in close physical proximity with a victim relies on Kansas cases decided prior to *Jones* and cases from other jurisdictions. Although Peterman did not come in close physical proximity with a child, his intent was to have sexual intercourse with a child. Peterman's act of driving to meet Davis to pick up a child for the purpose of sexual intercourse constituted an overt act beyond mere preparations. Peterman went as far as he could toward completing his criminal intentions prior to discovering that the child victim was fictional.

The judgment of the Court of Appeals reversing the district court is reversed. The judgment of the district court is affirmed.

ˋ LOCKETT, J., Retired, assigned.

ALLEGRUCCI, J., dissenting: I respectfully dissent from the majority of this court in reversing the Court of Appeals as to the attempted rape conviction. I agree with the majority of the Court of Appeals in finding insufficient evidence of an overt act.

Although the Court of Appeals majority mentions the lack of a victim, its conclusion did not rest solely on that fact. Instead, the majority concluded that the State failed to establish attempted rape. The Court of Appeals stated:

"Obviously, Peterman's intentions were morally reprehensible and disgusting. Nevertheless, it is not our role to be influenced by our sensibilities rather than the letter of the law. Unless and until our legislature proscribes a crime of 'intent and preparation to commit rape with a child,' we must avoid the temptation to punish such conduct as attempted rape as currently defined and construed."

I agree. I would affirm the Court of Appeals' decision affirming in part, reversing in part, and remanding to the district court.