NOT DESIGNATED FOR PUBLICATION

No. 115,108

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JEREMIAS OGDEN,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Opinion filed June 16, 2017.
Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Lesley A. Isherwood*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before GARDNER, P.J., PIERRON, J., and BURGESS, S.J.


*Per Curiam*: Jeremias Ogden appeals his jury conviction for attempted aggravated indecent liberties with a child, arguing the evidence was insufficient. Upon our review of the record and the parties' briefs, we affirm Ogden's conviction.


FACTUAL AND PROCEDURAL BACKGROUND

In January 2014, Ogden placed an ad on Craigslist seeking a sexual relationship. The ad caught the attention of Detective Jennifer Wright of the Wichita Police

1

Department due to the fact Ogden said he was open to "any age or race." Detective Wright responded to Ogden's ad posing as a fictitious 15-year-old girl, Miranda Wright, and told him she was new to the Wichita area. Over the course of their 3-day email exchange, Miranda told Ogden she was 15 years old no fewer than four times. Ogden asked Miranda what she was interested in doing and requested she send him a picture. Miranda sent Ogden a picture, which was actually a photo of a female Wichita police officer taken in her early teen years, and asked what he was looking for. Ogden replied he was "looking to get down an [*sic*] dirty see if I can find a girl to be a fwb kinda thing." According to Detective Wright, "fwb" stands for friends with benefits, implying a sexual relationship.

Ogden sent Miranda a picture of himself and told her he was 27 years old. Ogden inquired whether Miranda was interested and she responded that she was. Ogden asked when they could meet, and Miranda indicated she would be able to meet him the following day.

Shortly after 8 a.m. on January 31, 2014, Miranda contacted Ogden via email. They engaged in a somewhat ambiguous discussion regarding where they could meet and what they intended to do. While there was never an explicit discussion about having sexual intercourse, Miranda indicated she was worried about the possibility of getting pregnant, and they discussed ways to prevent pregnancy, including the use of condoms. At 9:49 a.m., Miranda sent Ogden an email suggesting they meet at the QuickTrip (QT) convenience store near her house. Miranda told Ogden to meet her behind the QT at 11 a.m. and asked him to bring condoms. Miranda stated they could come back to her house because her aunt would not be home. Ogden responded 5 minutes later, asking if she was certain her aunt would not be home. Miranda confirmed her aunt would not be coming home for lunch and asked Ogden what his truck looked like. Ogden indicated he would be driving a green truck.

2

At 10:46 a.m., Miranda indicated she would be leaving to go to the QT in a few minutes. Four minutes later, Ogden responded, "Ok." At 11:07 a.m., Miranda messaged Ogden, "Where ya at?" Ogden did not reply. At 11:11 a.m., Miranda messaged Ogden, "It's cold!!! I'm inside but can't hang out all day in here so maybe standing on backside." Ogden did not reply.

Detective Wright and a fellow Wichita Police Detective, Ken Davis, drove to the QT to wait for Ogden. Detective Wright observed a green truck sitting in the parking lot of a restaurant across from the QT. The detective recognized Ogden as the sole occupant of the vehicle. Ogden sat in the parking lot for several minutes. At 11:13 a.m., Ogden drove into the QT parking lot and parked in front of the building. Ogden walked inside and came out a few minutes later carrying a soda. As Ogden was walking back to his truck, he was approached by officers and arrested. A subsequent search revealed a condom in Ogden's wallet.

The State charged Ogden with a single count of attempted aggravated indecent liberties with a child. A jury convicted Ogden as charged and he was sentenced to 32 months' imprisonment, suspended to 36 months' supervised probation. Ogden timely filed a notice of appeal.

ANALYSIS

Ogden argues the evidence was insufficient to support his conviction, asserting he did not commit an overt act toward the completion of the attempted crime.

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. In determining whether there is

sufficient evidence to support a conviction, the appellate court generally will not reweigh evidence or credibility of witnesses. *State v. Dunn*, 304 Kan. 773, 821-22, 375 P.3d 332 (2016). It is only in rare cases where the testimony is so incredible that no reasonable factfinder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

In pertinent part, K.S.A. 2016 Supp. 21-5301(a) defines attempt as "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." To convict Ogden of attempted aggravated indecent liberties with a child, the State was required to prove he intended to have sexual intercourse with a child more than 14 years of age but less than 16 years of age and committed an overt act toward the perpetration thereof. See K.S.A. 2016 Supp. 21-5506(b)(1) (defining aggravated indecent liberties with a child); K.S.A. 2016 Supp. 21-5301(a) (defining attempt).

> "Kansas law does not provide definitive rules as to what constitutes an overt act for attempting crime. The overt act necessarily must extend beyond mere preparations made by the accused and must approach sufficiently near to the consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense." *State v. Peterman*, 280 Kan. 56, 60-61, 118 P.3d 1267 (2005) (citing *State v. Hedges*, 269 Kan. 895, 905, 8 P.3d 1259 [2000]).

*Ogden intended to commit the attempted crime.*

Miranda suggested meeting at the QT near her house, then they could go to her house because her aunt would not be home. Miranda also asked Ogden to bring condoms because she did not want to get pregnant. Ogden responded 5 minutes later asking if Miranda was sure her aunt would not be home. Although never explicitly stated, Ogden's statements as to the type of relationship he was seeking, the discussion of pregnancy, the use of condoms, and having the house to themselves strongly suggests an intent to have

4

sexual intercourse. There is no dispute Miranda claimed to be 15 years old, and Ogden does not dispute he intended to have sexual intercourse with her. Thus, there is sufficient evidence Ogden intended to commit aggravated indecent liberties with a child. See K.S.A. 2016 Supp. 21-5506(b)(1).

*Ogden committed an overt act toward the perpetration of the attempted crime.*

Ogden asserts his actions did not constitute an overt act. He argues they showed mere preparation for the offense. In support of his argument, Ogden points to the fact he failed to show up at the specified time, failed to go to the specified location, and failed to look for or contact Miranda while at the QT. Indeed, Ogden arrived at the QT 13 minutes after the scheduled meeting time. Ogden parked in front of the convenience store, rather than behind, and went in the front entrance and walked out a few minutes later carrying a soda. There was no evidence presented as to what Ogden did inside the QT other than purchase a soda. Specifically, there was no testimony, pictures, or video showing Ogden looked for Miranda while inside the convenience store. Further, Ogden did not loiter around the QT. Ogden conducted a lawful transaction, left the convenience store, and headed back to his truck. Ogden had not responded to any of the messages Miranda sent after she purportedly arrived at the QT.

In its brief, the State asserts the postarrest search of Ogden's wallet revealed "a brand of condom . . . different from those he utilized during intimate relations with his wife." If true, this might suggest Ogden procured the condom to use with Miranda. Unfortunately for the State, no such evidence was presented at trial. In fact, there was a stipulation regarding Detective Davis' interview of Ogden's wife wherein the State agreed it would not go into specific details regarding the condom. Ogden's wife did not testify at trial. Pursuant to the stipulation, Detective Davis testified he interviewed Ogden's wife and she identified the photograph Ogden sent to Miranda. Detective Davis further stated a

condom was found in Ogden's wallet but gave no additional details. The State's assertion is unsupported by the record and is of no value to the analysis.

Standing alone, Ogden's actions at the QT and the condom in his wallet do not conclusively establish an overt act toward the completion of a crime. However, this court must consider all of the evidence, viewing it in the light most favorable to the State. *Dunn*, 304 Kan. at 821-22. Based on rational inferences from the timing and nature of the emails, particularly in the 2 hours prior to Ogden's arrest, a reasonable factfinder could conclude he went to the QT to meet Miranda with the ultimate intent of engaging in sexual relations.

Miranda sent Ogden a message at 10:47 a.m. indicating she would be leaving to go to the QT in a few minutes. Four minutes later he responded, "Ok." Thus, it does not appear Ogden went to the QT by happenstance. It appears Ogden did so to meet Miranda. Ogden arrived 13 minutes late; however, he had been waiting in a parking lot of a nearby restaurant for some time prior. A jury could easily infer that Ogden did so to reconnoiter the situation. Further, Miranda's messages at 11:07 and 11:11 a.m. both suggested she was at the QT. The fact Ogden arrived late means very little when he was already waiting nearby and had reason to believe Miranda was still inside the convenience store. Moreover, while Ogden was supposed to meet Miranda behind the QT, her second message—sent 2 minutes prior to his arrival—stated she went inside because she was cold. Although it is unclear exactly how long Ogden was inside the QT or what he did (other than purchase a soda), it can be reasonably inferred he believed Miranda was still there and went inside the convenience store to meet her.

While it appears Ogden went into the QT to meet Miranda, the determinative question is whether doing so was sufficient to constitute an overt act. "The overt act necessarily must extend beyond mere preparations made by the accused and must approach sufficiently near to the consummation of the offense to stand either as the first

6

or subsequent step in a direct movement toward the completed offense." *Peterman*, 280 Kan. at 61. Miranda explicitly stated they would meet at the QT, then go to her house. She further implied they would have sexual intercourse at her house. There were no intervening or conditional circumstances in the proposed series of events. Meeting Miranda at the QT would be the first or subsequent step in a direct movement to the completed offense. Accordingly, the evidence was sufficient to prove Ogden committed an overt act toward the completion of the attempted crime.

Affirmed.