NOT DESIGNATED FOR PUBLICATION

No. 116,026

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOHN ROSS STENBERG,
*Appellant*.

MEMORANDUM OPINION

Appeal from Gray District Court; E. LEIGH HOOD, judge. Opinion filed October 6, 2017. Affirmed in part and vacated in part.

*Christina M. Kerls*, of Kansas Appellate Defender Office, for appellant.

*Curtis E. Campbell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MCANANY, P.J., STANDRIDGE, J., and WALKER, S.J.

PER CURIAM:  John Ross Stenberg was convicted of one count of rape, two counts of aggravated criminal sodomy, and one count of aggravated indecent liberties with a child. On appeal, he argues that the district court erred by (1) denying the motion to suppress oral and written statements he made to law enforcement, (2) failing to, on its own accord, instruct the jury regarding the lesser included offense of attempted rape, and (3) improperly sentencing him to lifetime postrelease supervision. For the reasons stated below, we find no error in the district court's ruling on the motion to suppress or in the instructions it provided to the jury. Because Stenberg was improperly sentenced to lifetime postrelease supervision, however, we vacate that portion of Stenberg's sentence.

1

K.P. and A.P. are sisters. Their mother, Stacey, was married to Stenberg. K.P. and A.P. lived with Stacey and Stenberg in Cimarron, Kansas, until January 2014, when the Kansas Department for Children and Families (DCF) removed the girls from the house and sought to have them adjudicated as children in need of care. DCF placed the girls in the home of Stephanie Casanova, who was a licensed foster parent. At the time of placement, K.P. had just turned five years old, and A.P. was three years old.

About four to five months after the girls were placed with Casanova, K.P. spontaneously announced at the dinner table that Stenberg "put his pee-pee on my pee-pee." Casanova reported K.P.'s statement by notifying the assigned social worker and calling an abuse hotline.

About a week later, A.P. disclosed at the dinner table that Stenberg had put his "pee-pee" in her mouth. K.P. and A.P. then talked with each other about what Stenberg had done to them, including having them get in bed with him naked. Casanova again reported the abuse, and an investigation into the allegations was initiated.

On May 16, 2014, Casanova took both girls to a Garden City police station for forensic interviews. Bethanie Popejoy, Senior Special Agent for the Kansa Bureau of Investigation assigned to the Child Victims Unit, interviewed the girls separately. The purpose of the interviews was to provide the girls an opportunity and a safe place to talk about the disclosures they already had made to Casanova. The interviews were video recorded.

K.P. told Popejoy that Stenberg had "put his pee-pee in [her] pee-pee," terms that Popejoy already had established referred to his penis and her vagina. K.P. acted out Stenberg's movements on the floor using her body, showing Popejoy how Stenberg

kneeled over her and thrusted his hips so that "his privates would touch her privates." K.P. also role-played using anatomically realistic dolls representing her and Stenberg to demonstrate what Popejoy described as the missionary intercourse position. Popejoy testified that, based on K.P.'s testimony and descriptions, she believed it would have been "nearly impossible" for Stenberg not to have penetrated K.P.'s outer vagina. K.P. told Popejoy that Stenberg engaged in the conduct described more than once, but she was not able to confirm how many times. K.P. said she was four years old when it happened.

Special Agent Popejoy then interviewed A.P., who reported that Stenberg had "put his wee-wee in [her] mouth" and "put his wee-wee in [her] pee-pee." Popejoy had talked about anatomical terms with A.P. and understood that "wee-wee" referred to Stenberg's penis and "pee-pee" was A.P.'s vagina. A.P. also role-played Stenberg's actions with dolls representing her and Stenberg. A.P. told Popejoy that Stenberg had put his penis in her mouth "a lot of times," but she was not able to specify how many.

On May 19, 2014, Undersheriff Jeff Sharp interviewed Stenberg about the girls' statements. At the end of the interview, which lasted almost two hours, Stenberg verbally admitted he had rubbed his penis against K.P.'s vagina and put his penis in A.P.'s mouth twice. Stenberg then signed a written confession, in which he admitted that he twice "placed [his] soft penis against [A.P.'s] lips," that he "rubbed [his] soft penis against [K.P.] when [he] awoke from sleeping with no clothes on," and that he "rubbed it against her vagina."

The State charged Stenberg with one count of rape, two counts of aggravated criminal sodomy, and one count of aggravated indecent liberties with a child. K.P. and A.P. both testified at trial. The jury convicted Stenberg as charged. The district court sentenced Stenberg to life in prison with no possibility of parole for 25 years on each of the four counts, ordering counts 1 and 4 to run consecutive to counts 2 and 3.

3

ANALYSIS

This is Stenberg's direct appeal. In it, he claims the district court erred by: (1) denying his motion to suppress the oral and written statements he made to Undersheriff Sharp during his interview, (2) failing, on its own accord, to provide the jury with an instruction on the lesser included offense of attempted rape, and (3) improperly sentencing him to lifetime postrelease supervision. We address each of Stenberg's claims in turn.

1. *Motion to suppress*

In support of the motion to suppress the oral and written statements he made during his custodial interview, Stenberg argued to the district court that the coercive tactics used by Undersheriff Sharp in interrogating him necessarily rendered those statements involuntary and inadmissible. After considering the video recording of the interrogation, the testimony from Sharp and Stenberg, and arguments from counsel, the district court determined that Stenberg's oral and written statements were voluntarily made; thus, the court denied Stenberg's motion.

On appeal of a district court's decision on a motion to suppress, an appellate court applies a dual standard of review:

> "'An appellate court generally reviews a trial court's decision on a motion to suppress using a bifurcated standard. The trial court's findings are first reviewed to determine whether they are supported by substantial competent evidence. Appellate courts do not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence. The ultimate legal conclusion regarding the suppression of evidence is then reviewed de novo. . . . [Citations omitted.]'" *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016).

When a defendant challenges his or her statement to a law enforcement officer as involuntary, the State must prove the voluntariness of the statement by a preponderance of the evidence. *State v. Brown*, 305 Kan. 674, 683-84, 387 P.3d 835 (2017). The essential inquiry in determining whether a statement is voluntary is "whether the statement was the product of the free and independent will of the accused." *State v. Walker*, 283 Kan. 587, 596, 153 P.3d 1257 (2007). To make such an inquiry, the district court looks at the totality of the circumstances surrounding the statement and considers the following factors:

"(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." *Walker*, 283 Kan. at 596-97.

Although he acknowledges courts are required to look at the totality of the circumstances by using the five factors set forth above, Stenberg focuses solely on one of the five factors: the fairness of Undersheriff Sharp in conducting the interrogation. Stenberg claims his confession was involuntary because Sharp misrepresented facts, misrepresented the law, and made implicit threats and inappropriate promises.

a. *Misrepresenting facts*

Stenberg argues that Undersheriff Sharp factually misrepresented (a) A.P.'s allegations against him and (b) other law enforcement personnel's opinion regarding the strength of A.P.'s and K.P.'s interviews. After watching the video of the interrogation and hearing other evidence, the district court concluded that "[n]owhere in this interview do I see that Undersheriff Sharp lied to the Defendant, misrepresented any of the facts that he had available to him based on his conversation, his own investigation, or his conversation

5

with other officers who were involved in this investigation." Based on our independent review of the record, we find substantial competent evidence supports the court's holding.

False statements about the evidence do not, on their own, render a defendant's confession involuntary. See, e.g., *State v. Randolph*, 297 Kan. 320, 333-34, 301 P.3d 300 (2013) ("Even if we consider [the detective's] statements—or the implication of them—to have been knowingly false, this court has repeatedly declined to find it to be an inherently impermissible interrogation technique for a law enforcement officer to make a false claim that there was evidence implicating a suspect in a crime."); *State v. Morton*, 286 Kan. 632, 652, 186 P.3d 785 (2008); *State v. Wakefield*, 267 Kan. 116, 128, 977 P.2d 941 (1999). Instead, false statements must be viewed in conjunction with the totality of the circumstances surrounding the confession to determine whether it was voluntarily made. *Morton*, 286 Kan. at 652.

With regard to specific instances of false facts told to him, Stenberg claims Undersheriff Sharp told him A.P. alleged Stenberg put his penis into her *vagina*, when in fact A.P. only claimed that Stenberg put his penis into her *mouth*. But the evidence shows that during her interview with Special Agent Popejoy, A.P. repeatedly stated that Stenberg had put his "wee-wee" in her "pee-pee," which Popejoy previously had established was A.P.'s terminology to describe Stenberg putting his penis in her vagina. Sharp reviewed the video evidence, which would have included A.P.'s statement, prior to interrogating Stenberg. Thus, there is substantial competent evidence in the record to support the district court's finding that Sharp's statement did not misrepresent any facts regarding A.P.'s allegations.

In another instance, Stenberg argues Undersheriff Sharp falsely represented to Stenberg that other law enforcement personnel in the department believed the videos were the best interviews they have had with a four-year-old child and five-year-old child, graphic, and "pretty good evidence." Stenberg contends that Special Agent Popejoy

testified differently at trial by saying that the interviews were "not necessarily" some of the best she had ever seen. Stenberg also contends that the interviews were not in fact graphic.

Stenberg did not make this particular false representation argument to the district court. In fact, defense counsel stated during the motion hearing:

> "To me, [the videos] didn't look particularly special, but I believe Undersheriff Sharp
> when he says: Based on what I saw and based on what I was told, these were really great
> pieces of evidence for the State. So we're not really . . . alleging any sort of deception
> with regard to the evidence."

Issues not raised below are not properly before this court on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014). And even if the issue was properly raised on appeal, the record reflects that Undersheriff Sharp represented to Stenberg that several *other officers* told him the videos were good evidence. But Stenberg cites only to Special Agent Popejoy's testimony at trial in which she stated her belief the interviews were "not necessarily" some of the best she personally had ever seen. This testimony on its own does not establish that Sharp's representation about the opinion of other officers false. Moreover, the question of whether the videos were considered good evidence or graphic to other officers is more appropriately seen as an opinion than a fact.

We find substantial competent evidence supports the district court's finding that Undersheriff Sharp did not misrepresent facts conveyed to Stenberg in the interview.

b. *Misrepresenting the law*

Stenberg next argues that Undersheriff Sharp misrepresented the legal seriousness of the allegations against him. Both A.P. and K.P. alleged that Stenberg's penis was "soft" during the incidents. Stenberg contends that Sharp repeatedly and improperly suggested

throughout the course of the interview that there was some sort of legal distinction between rape with an erect penis and rape with a soft penis. Stenberg maintains that these improper suggestions of a legal distinction between rape with an erect penis and rape with a soft penis coerced him into confessing to sexually abusing the girls with a soft penis, which he believed would be seen as a less serious crime. After watching the video of the interrogation and hearing other evidence, the district court found Undersheriff Sharp did not suggest to Stenberg that there was some sort of legal distinction between rape with an erect penis and rape with a soft penis.

"While telling a suspect false information about the *evidence* against the suspect, standing alone, does not render a confession involuntary, giving the suspect false or misleading information about the *law* is more problematic." (Emphasis added.) *Morton*, 286 Kan. at 652. Courts do not, however, automatically find an accused's statement to be involuntary just because there may have been a misrepresentation of the law during the interrogation. If a legal misrepresentation has been made, it must be considered along with the rest of the voluntariness factors as part of the court's review of the totality of the circumstances. See *State v. Ackward*, 281 Kan. 2, 15-16, 128 P.3d 382 (2006).

In his interrogation of Stenberg, Undersheriff Sharp contrasted rape that occurs with an erect penis and rape that occurs with a soft penis. For example:

"[Sharp]:     I'll be honest, the way [A.P. and K.P.] sat there and said at one point was . . . your penis was soft and that's when penetration occurred both orally and vaginally. So, the thing is, I mean your defense on the matter, if that's the case, you aren't classically raping anybody. . . . If your penis is hard and you are ramming it into somebody, a lot of people would say that would be rape. Would you agree with me on that?
"[Stenberg]:  A lot of people would say if the penis is soft it would be the same thing.

8

"[Sharp]:    But is it though? Is it the same? . . . It's not like you seduced somebody in the bedroom and then forcefully raped somebody with an erect penis to get off . . . and then ejaculated inside anybody. . . .

. . . .

"[Sharp]:    You and I are miles apart on this, but to me when you think of a penis that is erect, if it is an erect penis, then you're thinking that it is sexual prowess, sexual power, and everything else. But if it's not erect, then you're done. You're done masturbating, you've ejaculated. . . .

. . . .

"[Sharp]:    This is more than just a casual brushing up against . . . but there is a difference. There's a difference between taking your erect penis and ramming it into a little girl's vagina, and there's a difference between if you brushed your semi-erect or soft penis against somebody's labia. To me there is a difference. What a jury is going to see is when they say there's penetration, they're going to see you and they're going to see that little girl on the stand and they are going to think that you're just ramming her with your dick as hard as you can. Because they don't see that you give in to urges and he rubbed his penis up against her vagina and the penetration was just ever so slight. They don't do that. They see you just ramming her as hard as you can to get sexual gratification because you don't give a shit. That's what they see. That's what a jury's mind sees."

In Kansas, the crime of rape is defined in K.S.A. 2016 Supp. 21-5503(a):

"(1) Knowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse under any of the following circumstances:
        (A) when the victim is overcome by force or fear; or
        (B) when the victim is unconscious or physically powerless;
"(2) Knowingly engaging in sexual intercourse with a victim when the victim is incapable of giving consent because of mental deficiency or disease, or when the victim is incapable of giving consent because of the effect of any alcoholic liquor, narcotic, drug or other substance, which condition was known by the offender or was reasonably apparent to the offender;

9

"(3) sexual intercourse with a child who is under 14 years of age;

"(4) sexual intercourse with a victim when the victim's consent was obtained through a knowing misrepresentation made by the offender that the sexual intercourse was a medically or therapeutically necessary procedure; or

"(5) sexual intercourse with a victim when the victim's consent was obtained through a knowing misrepresentation made by the offender that the sexual intercourse was a legally required procedure within the scope of the offender's authority."

Stenberg was ultimately charged and convicted of raping K.P. pursuant to 21-5503(a)(3), because K.P. was under 14 years old at the time of the offenses. Under Jessica's Law, the presumptive sentence for a defendant who is 18 years or older and convicted of rape is life in prison with no possibility of parole for 25 years. K.S.A. 2016 Supp. 21-6627(a)(1)(B). Stenberg contends that, because of K.P.'s age, any penetration would have subjected him to the same sentence under Jessica's Law, regardless of whether his penis was erect or soft. Given this statutory mandate, Stenberg argues Undersheriff Sharp's suggestion during the interview that there was some sort of legal distinction between rape with an erect penis and rape with a soft penis was an improper coercive tactic that ultimately rendered his oral and written statements inadmissible.

In *Ackward*, the defendant was accused of shooting an unarmed victim in the back as the victim was walking away after a drug transaction. During Ackward's interrogation, the detective made several misrepresentations of the law based on the facts presented in that particular case. First, the detective suggested that the killing might have been a reckless homicide. The court held that it was "probably misleading" to contrast reckless homicide with first-degree murder in that case because while it "may be accurate as a matter of law, . . . reckless homicide is not likely to be within the contemplation of the interrogating officer in the circumstances and when the victim was shot in the back." 281 Kan. at 14. The detective also misled the defendant about the law by suggesting that the killing could be excused as self-defense, but "where the victim died when shot in the back, neither perfect nor imperfect self-defense is likely to be applicable." 281 Kan. at

10

15. The court considered the misrepresentations in light of the totality of the circumstances, which also included repeated use of false information, phony forensic analysis, and religious references. 281 Kan. at 15. Nevertheless, based on its review of the totality of the circumstances, the court held that Ackward's statements were the product of his free and independent will, noting that the mistakes of law were "not egregious, and in some cases they were more an exaggeration rather than false." 281 Kan. at 16.

In this case, Undersheriff Sharp's suggestion that there may be a difference between rape with an erect penis and rape with a soft penis likely was misleading because this fact makes no difference in a case such as this where the victims were younger than 14 years old, the perpetrator was older than 18 years old, and Jessica's Law applied. The State would have charged Stenberg under 21-5503(a)(3) regardless of whether Stenberg's penis was erect or soft when the penetration occurred. If a legal misrepresentation has been made, it must be considered along with the rest of the voluntariness factors as part of the court's review of the totality of the circumstances. See *Ackward*, 281 Kan. at 15-16.

Based on our review of the record here, it is a very close call as to whether there is substantial competent evidence to support the district court's conclusion that no legal misrepresentation was made here. But we need not make that decision in this case because, as discussed below, even if Undersheriff Sharp's suggestion that there was some sort of legal distinction between rape with an erect penis and rape with a soft penis was an improper coercive tactic, we would still find Stenberg's oral and written statements were voluntarily made based on our review of the totality of the circumstances.

c. *Implicit threats and inappropriate promises*

Finally, Stenberg argues his oral and written statements during the interview were coerced because Undersheriff Sharp threatened to tell the county attorney whether he was

cooperating with the investigation. Specifically, Stenberg alleges Sharp said he would talk to the county attorney with regard to leniency if Stenberg confessed. Stenberg also said Sharp would notify the county attorney if Stenberg failed to cooperate in the investigation by not confessing. In cases where the defendant fails to cooperate or confess, Sharp told Stenberg the county attorney was not usually inclined to engage in any plea negotiations.

After reviewing the video and hearing other evidence, the district court concluded that there were numerous times when Undersheriff Sharp said that if Stenberg did not cooperate, it would go badly for him and the prosecutors may not offer a plea agreement. The court held that the statements made by Sharp could be construed as implicit threats for lack of cooperation with law enforcement and that Sharp's statements were "close to the line." However, the court ultimately held:

> "[The c]ourt finds by a preponderance of the evidence that the statement made or statements made to Undersheriff Sharp are freely and voluntarily presented. They're not the product of any coercion or undue threats. They're not the product of any promises by Undersheriff Sharp that he was going to do or not do something on behalf of this Defendant that he didn't do."

On appeal, Stenberg challenges the district court's holding as erroneous and cites *State v. Swanigan*, 279 Kan. 18, 106 P.3d 39 (2005), in support of the court's error. In *Swanigan*, our Supreme Court addressed the issue of implicit threats for both cooperation and lack of cooperation with law enforcement. Swanigan was accused of robbing a convenience store. The interrogating officers urged Swanigan to confess so they could report to the county attorney that he had "cooperated" with them. When Swanigan denied involvement in the crime, the interrogating officers threatened to tell the county attorney that Swanigan had refused to cooperate and suggested—like here—that the county attorney would reject a deal for leniency. The officers also implied that Swanigan could

12

be charged with five robberies, rather than just one, if he did not confess. 279 Kan. at 32-33.

The *Swanigan* court ultimately held that "without more, a law enforcement officer's offer to convey a suspect's *cooperation* to the prosecutor is insufficient to make a confession involuntary." *Swanigan*, 279 Kan. at 33. But the *Swanigan* court held a higher standard of review applied with regard to an officer's threats to tell the county attorney about a defendant's *lack of cooperation*. The court concluded that threatening a defendant with the prospect that his or her lack of cooperation will be forwarded to the sentencing judge is inconsistent with Swanigan's right to remain silent as articulated in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). 279 Kan. at 36.

> "[In *Miranda*], the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege against self-incrimination from the inherent pressures of the interrogation atmosphere. Included in the mechanism is a requirement for informing the suspect of the right to remain silent, accompanied by the assurance of a continuous opportunity to exercise it throughout the interrogation. [Citation omitted.]" 279 Kan. at 36.

At the end of the day, however, the *Swanigan* court held that a law enforcement threat to tell a charging authority about a defendant's lack of cooperation does not render a confession involuntary per se, but again is a factor for determining voluntariness that should be considered in the totality of the circumstances. 279 Kan. at 37. After considering all of the circumstances, the court found that Swanigan's confession was involuntary because there was evidence that (1) the officers repeatedly used false information and evidence; (2) the tactics used by the officers—including threats to convey Swanigan's lack of cooperation to the county attorney and threatening to charge him with additional robberies unless he confessed—were unfair; and (3) Swanigan had low intellect and susceptibility to anxiety. The court expressly noted that "any one of these factors," when considered alone, might not be sufficient to show coercion. Rather,

13

the combination of all of these factors led the court to find the statement involuntary. 279 Kan. at 39.

Turning back to the case here, Stenberg contends several statements made by Undersheriff Sharp were impermissible under *Swanigan*. The video of the interview supports Stenberg's arguments, including the following statements:

> "[Sharp]: When the county attorney gets these kind of cases and the evidence we currently have, they do not want to make a deal, they do not want to have any reason to have a conversation with you. And what I mean by that, and I'm not threatening you, but my conversations with them about this, is when something like this happens, and we don't get the information from the person we talk to when we know that information is there, they very much want to take this to a jury type trial. . . . When I talk to the prosecutor and he says that he wants to take this to a jury trial, and if that would happen with those two girls getting on the stand with those two girls saying what they've said, and with a taped interview, your chances are slim to none. . . .
>
> . . . .
>
> "[Sharp]: What I'm trying to get from you today is your cooperation. Because I'm telling you, it doesn't matter if it's a Gray County jury, a Ford County jury, the State of Kansas with conservative people we have in this state—you've lived here 10 years—if there's a five-year-old and a four-year-old go up on the stand, and they have to sit there and say, 'my dad, my stepdad did this to me,' people are going to want to have your head on a platter. . . .
>
> . . . .
>
> "[Sharp]: I can't go to the prosecutor and help you out if you sit there and say . . . If I tell them like you don't know, you don't know, there's circumstantial this, circumstantial that. If I can't give them anything, the prosecutor is going to want to take you to court. He's not going to want to make a plea agreement. . . .
>
> . . . .
>
> "[Sharp]: If I go over there and tell [the county attorney] that you skirted around the issue, and you bounced around the issue and we sat here and talked and you

14

had really no real information to give me, he's going to want to take you to jury trial. He's going to beg that you go to a jury trial because he knows that you're probably going to look at quite a bit of time at that stage, because he's going to say that you're being untruthful about it. . . .

. . . .

"[Sharp]: It's not a matter if you did or you didn't—you need to tell me what happened on your behalf. Because I really can't go to the prosecutor and tell him. . . . If you have remorse about what happened, there's a chance that things are going to be less than what they are now. Because if we have to put the girls on the stand and put them through that, he's going to request anything and everything he possibly can, plus the kitchen sink to throw at you. If you accept this that you made a mistake and you man up to things, [the county attorney] will take a plea agreement on it at my recommendation. But if he sees I'm here for two and three and four hours and you're not wanting to play ball. . . .

. . . .

"[Sharp]: You're leaving me no choice but to go into my office and draw up that criminal affidavit, and I'm not saying you're not cooperating but you're not cooperating. You've got stories and you're not telling me. . . .

. . . .

"[Sharp]: I understand from your perspective you're thinking if I confess to this then I'm screwed, but you not confessing to things that you've done is screwing you."

Like in *Swanigan*, Undersheriff Sharp not only suggested Stenberg would have more positive consequences if he confessed to the crimes, but suggested negative consequences if he did not confess: elimination of any opportunity to negotiate a plea agreement with the county attorney and certain conviction by a jury. Sharp's statements are inconsistent with *Swanigan*'s right to remain silent as articulated in *Miranda*; therefore, we will consider the impropriety of Sharp's threats as a factor in deciding whether Stenberg's verbal and written statements were voluntary in the context of all of the circumstances presented. See *Swanigan*, 279 Kan. at 37.

15

Stenberg also contends that Undersheriff Sharp made improper promises of leniency if he confessed. For example, Sharp told him "I'm throwing you a life preserver here," and "I'm telling you the only person that can save you at least a little bit of grief is me."

> "[I]n order to render a confession involuntary as a product of a promise of some benefit to the accused, including leniency, the promise must concern action to be taken by a public official; it must be such that it would be likely to cause the accused to make a false statement to obtain the benefit of the promise; and it must be made by a person whom the accused reasonably believed to have the power or authority to execute it. [Citations omitted.]" *State v. Harris*, 284 Kan. 560, 579-80, 162 P.3d 28 (2007).

There is no evidence of any such promise or benefit made in this case. Undersheriff Sharp did not promise that a public official would perform any specific benefit for Stenberg. As the district court noted, the county attorney did make plea offers, but no deal was reached.

d. *Totality of the circumstances*

Stenberg argues the coercive tactics used by Undersheriff Sharp in interrogating him necessarily rendered those statements involuntary and inadmissible. But as we noted above, this court must consider the *totality* of the circumstances surrounding the interrogation, including findings on the other voluntariness factors: the accused's mental condition; the manner and duration of the interrogation; the accused's ability to communicate with the outside world; the accused's age, intellect, and background; and the accused's fluency with the English language. *Walker*, 283 Kan. at 596-97. "'The ultimate legal conclusion regarding the suppression of evidence is then reviewed de novo.'" *Patterson*, 304 Kan. at 274.

16

With regard to Stenberg's mental condition, the district court noted Stenberg had two associate degrees, spoke and understood English well, communicated and testified appropriately, and did not appear affected by low blood sugar brought on by his diabetes. As to the manner and duration of the interrogation, the court noted that the two-hour interview was not overly long, and Undersheriff Sharp did not raise his voice, but was conversational, professional, and sat close to Stenberg. The court reviewed the interview video and found no evidence bearing on Stenberg's ability to communicate with the outside world. With regard to Stenberg's age, intellect, and background, the court noted that Stenberg was in his 40s, spoke in a manner consistent with someone of average or above-average intelligence based on his educational background, and that he had knowledge of how the criminal justice system worked based on his criminal history in Kansas and California. Finally, the court found no reason to believe that Stenberg had any issue with understanding the English language. With regard to the fairness of the officer in conducting the interrogation, we note Sharp suggested on multiple occasions during the interview that there may be some sort of legal distinction between rape with an erect penis and rape with a soft penis. We also note statements by Sharp advising Stenberg that if he did not confess, the county attorney would be unwilling to negotiate a plea and he would face certain conviction at a jury trial.

Although we have found for purposes of this opinion that two of the interrogation tactics employed by Undersheriff Sharp were coercive, we nevertheless find Stenberg's statements were voluntary and the product of free and independent will when considered in conjunction with all of the other circumstances surrounding the interrogation. In making this finding, we do not condone the coercive tactics used by law enforcement in this case. But when we consider the totality of the circumstances surrounding the interrogation, we are not persuaded that the unfair tactics overcame Stenberg's free will and caused his statements to be involuntary.

17

Our conclusion regarding the voluntary nature of Stenberg's oral and written statements is supported by the timing of Stenberg's verbal and written admissions. Assuming there is some sort of coercion, "there must be a link between the coercive conduct of the State and the confession." *Swanigan*, 279 Kan. at 40 (noting Swanigan changed his story shortly after officers lied to or threatened him). Here, Stenberg's confession did not immediately follow Undersheriff Sharp's inappropriate threats or misrepresentations of the law.

Finally, our conclusion is supported by the substance of the oral and written statements made by Stenberg during the interrogation. As noted by the district court, Stenberg's statements do not mirror what Undersheriff Sharp told him A.P. and K.P. alleged, but instead go beyond the details provided by Sharp. See *State v. Stone*, 291 Kan. 13, 29, 237 P.3d 1229 (2010) ("Stone did not volunteer facts but rather he adopted facts as they were suggested to him by the detective and as her insistence that he tell 'the truth' became more adamant."). For example, Stenberg told Sharp that when he rubbed his penis against K.P., she was lying down on the bed and he was standing at the edge of the bed. The information provided by Stenberg was not revealed by K.P. to her foster mother or to Special Agent Popejoy and, in turn, was not relayed from Sharp to Stenberg. With regard to A.P., Stenberg told Sharp about two specific instances in which he put his penis in A.P.'s mouth. Once, he woke up naked and she was in the bed next to him; he put his penis to her mouth to "see what it felt like" and she opened her mouth. Another time, A.P. walked into the bedroom while Stenberg was masturbating; when he got up to use the bathroom, he walked past A.P. and "brushed [his penis] across her lips." In contrast, A.P. only alleged that he had put his penis in her mouth.

For all of the reasons stated above, we find the district court did not err in admitting Stenberg's confession as a product of his free and independent will.

18

2. *Jury instruction on lesser included offense*

Stenberg contends the district court erred in failing to instruct the jury on attempted rape, a lesser included crime of rape. When analyzing jury instruction issues, appellate courts make three determinations: (1) whether the issue can be reviewed, (2) whether any error occurred, and (3) whether any error requires reversal. *State v. Barber*, 302 Kan. 367, 376-77, 353 P.3d 1108 (2015).

First, we address reviewability. Stenberg did not object to the alleged omission at trial. Ordinarily, an appellant may not challenge an issue that was not preserved for appeal. But there is a special rule for jury instructions, including lesser included crime instructions, in the Kansas statutes. We review those challenges for "clear error." See K.S.A. 2016 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict . . . or the failure to give an instruction is clearly erroneous.").

Second, we must determine whether there was any error. To make that determination, we consider whether the instruction was legally and factually appropriate, employing an unlimited review of the entire record. *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 (2012). Legal appropriateness is whether the instruction fairly and appropriately states the applicable law. Like all questions of law, this court reviews the legal question using an unlimited standard of review. To determine whether the jury instruction was factually appropriate, this court determines if there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, to support a factual basis for the instruction. *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

Third, if we find there was an error (instruction was legally and factually appropriate), then we must conduct a reversibility inquiry—what is commonly called the "clear error" test. An instruction is clearly erroneous when "'the reviewing court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred.'" *Barber*, 302 Kan. at 377; *Williams*, 295 Kan. 506, Syl. ¶ 5. Whether instructional error is clearly erroneous requires review of the entire record and de novo determination. The burden of showing clear error belongs to the complaining party. *Williams*, 295 Kan. at 516.

### a. *Legal and factual appropriateness*

Rape, as charged in this case, is defined as sexual intercourse with a child who is under 14 years of age. See K.S.A. 2016 Supp. 21-5503(a)(3). Sexual intercourse is defined as "any penetration of the female sex organ by a finger, the male sex organ or any object. Any penetration, however slight, is sufficient to constitute sexual intercourse." See K.S.A. 2016 Supp. 21-5501(a).

To establish the crime of attempted rape, the State would have been required to present evidence that Stenberg performed an overt act with the intent to commit a rape but failed to complete the crime. See K.S.A. 2016 Supp. 21-5301(a). The elements of attempted rape have been defined as requiring proof that the defendant:

> "(1) [P]erformed an overt act toward penetrating the sexual organ of a female child under the age of 14; (2) performed that act with the intent to penetrate the sexual organ of a female child under the age of 14; and (3) failed to penetrate the sexual organ of a female child under the age of 14." *State v. Peterman*, 280 Kan. 56, 60, 118 P.3d 1267 (2005).

An attempt to commit a crime is a lesser included offense of that crime. K.S.A. 2016 Supp. 21-5109(b)(3) (a lesser included crime includes "an attempt to commit the crime charged"). Therefore, attempted rape is a legally appropriate lesser included offense.

20

The parties dispute whether the attempted rape instruction is factually appropriate. Stenberg contends there was evidence presented at trial that could have supported the conclusion that he did not penetrate K.P.'s sexual organ, and therefore the jury could have found that he committed attempted rape. Stenberg correctly notes there was some evidence that could be consistent with a lack of penetration. At trial, K.P. testified Stenberg touched her "privates" with his "privates" by moving his hips while he was on top of her. She stated that his privates went "on top" of her privates and that Stenberg's movements did not "make [her] skin move." Undersheriff Sharp testified about Stenberg's confession at trial. In his written statement, Stenberg admitted that he "rubbed [his] soft penis against [K.P.] when [he] awoke from sleeping with no clothes on" and that he "rubbed it against her vagina."

K.P.'s statements in her interview with Special Agent Popejoy were inconsistent. She initially told Popejoy that Stenberg "put his pee-pee in my pee-pee" and "he put his pee-pee in mine," using language that Popejoy established indicated that Stenberg put his penis in her vagina. When Popejoy asked K.P. what Stenberg did with his pee-pee, K.P. said that "he wiggled it." However, when Popejoy asked her whether she could feel it "inside or only on her pee-pee," K.P. said it was "only on my pee-pee." And when Popejoy demonstrated Stenberg's acts with a tissue box, K.P. indicated that Stenberg's penis did not go inside of the line on the top of the box. K.P. role-played Stenberg's acts both by acting out Stenberg's movements on the floor using her own body and by using anatomically correct dolls provided by Popejoy. In both exercises, K.P. appeared to be demonstrating intercourse positions.

Popejoy testified at trial, however, that K.P.'s demonstrations of intercourse positions led her to conclude that penetration had occurred:

> "Q:  Take me through that disclosure. Was [K.P.] able to describe where, and when, or how?

21

"A: Yes. She was able to describe that where she was at was in her mother's bedroom that she shared with Daddy John [Stenberg]. In that—in that bedroom, she laid flat on the bed and [Stenberg] kneeled over her[]. And, as a matter of fact, she began to show with her own body how this went, and she did the crouching on the floor with her hands and knees on the floor, over, and would describe how she laid on the floor and how his privates would touch her privates as he was kneeling over her.

. . . .

"Q: Okay. Based on the description that was provided to you by [K.P.], were you able to form an opinion as to whether or not there was any penetration?

"A: The way she was talking about he would wiggle back and forth and thrust his hips, and she demonstrated very much an intercourse position with herself moving back and forth. That, with him, it would very—it would be nearly impossible for him to have his penis on the outside of the labia majora, the two largest lips on the female anatomy, without penetrating and going—breaking that pla[ne] into the labia minora and the vaginal opening."

K.P. was four years old at the time of the incident, five years old at the time she disclosed the incident to Casanova and Popejoy, and six years old at the time of her trial testimony. The State contends that K.P.'s testimony should not be treated as that of a "trained professional[] regarding degrees of penetration."

However, based on the record as a whole, we find sufficient evidence, viewed in the light most favorable to the defendant, to support a factual basis for the lesser included offense instruction for attempted rape. See *Plummer*, 295 Kan. 156, Syl. ¶ 1.

b. *Clear error*

Notwithstanding our finding that the lesser included instruction would have been legally and factually appropriate, we cannot reverse Stenberg's conviction unless we determine that the district court's failure to instruct the jury on attempted rape was clearly erroneous. To do so, this court must be firmly convinced that the jury would have

22

convicted Stenberg of a different crime had the instruction error not occurred. See *Barber*, 302 Kan. at 377; *Williams*, 295 Kan. 506, Syl. ¶ 5.

In support of a different verdict, Stenberg's sole assertion is that the jury would have convicted Stenberg of attempted rape because there was a "lack of evidence" of penetration. But this assertion is not accurate. K.P.'s statements in the video were inconsistent on the issue of penetration, as she alternately described Stenberg as putting his penis "in" or "on" her vagina. The same video showed her demonstrating that Stenberg engaged in intercourse positions with her. Popejoy testified that based on K.P.'s description of Stenberg's actions, it would have been "nearly impossible" for there to be no penetration. To establish penetration, "penetration of the vulva or labia is sufficient." *State v. Borthwick*, 255 Kan. 899, 914, 880 P.2d 1261 (1994). The evidence supported the jury's conclusion that Stenberg raped K.P.; we are not firmly convinced that the jury would have decided this case differently had the lesser included offense of attempted rape instruction been provided.

3. *Lifetime postrelease supervision*

Stenberg argues that the district court improperly ordered lifetime postrelease supervision, which necessarily renders his sentence illegal under K.S.A. 22-3504(1). Whether a sentence is illegal is a question of law over which this court has unlimited review. *State v. Trotter*, 296 Kan. 898, 902, 295 P.3d 1039 (2013).

Stenberg was convicted of one count of rape, two counts of aggravated criminal sodomy, and one count of aggravated indecent liberties with a child. The sentence for each conviction was off-grid; thus, the district court ordered life in prison with no possibility of parole for 25 years on each count. The court also ordered lifetime postrelease supervision for all four counts.

"An inmate who has received an off-grid indeterminate life sentence can leave prison only if the successor to the Kansas Parole Board grants the inmate parole. Therefore, a sentencing court has no authority to order a term of postrelease supervision in conjunction with an off-grid indeterminate life sentence." *State v. Cash*, 293 Kan. 326, Syl. ¶ 2, 263 P.3d 786 (2011).

The district court erred in ordering lifetime postrelease supervision. Accordingly, we vacate that portion of the sentence imposing lifetime postrelease supervision for each of the convictions.

Affirmed in part and vacated in part.